Cecil W. MILLER and Mildred E. Miller, Joint Tenants; Margaret L. Birchenough, Testamentary Trust, Donald L. Birchenough, Ansel Tobias and Walter Wright, Trustees; Ruth M. Hollinger, Individually and as Joint Tenant with Delbert Hollinger; John E. Edwards and Kermit C. Edwards, Joint Tenants; Homer Sharpe; Cecil M. Tobias and Frances Tobias, Joint Tenants; Paul F. Westrup and Ardis B. Westrup, Joint Tenants; Jay Brothers; Lyle Brothers, Individually and as Joint Tenant with Patricia R. Brothers; Alvin Engelland; Ansel Engelland; Jack Engelland and Vivian M. Engelland, Joint Tenants; Gerald M. Jones and Donna Jones, Joint Tenants; Robert A. Johannsen; Raymond E. Tobias; Gary Zwick; Lester Colle; Harvey Willhaus and Marilyn Willhaus, Joint Tenants; Edris Edwards; Edward F. Janda and Anna Mae Janda, Joint Tenants; Harry Zwick; Arthur H. Oden; Jolene J. Ottlinger; and William L. Bemis and Dorothy Bemis, Joint Tenants, Plaintiffs,

v.

CUDAHY COMPANY, a Delaware Corporation, and General Host Corporation, a New York Corporation, Defendants.

Civ. A. No. 77–1212.

United States District Court, D. Kansas.

March 3, 1987.

Turner & Boisseau Chartered, Great Bend, Kan., Deborah Carney, Golden, Colo., for plaintiffs.

Ron Campbell, Thomas D. Kitch of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

## OPINION AND ORDER

THEIS, District Judge.

Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties in Jarndyce and Jarndyce, without knowing how or why; whole families have inherited legendary hatreds with the suit. The little plaintiff or defendant, who was promised a new rocking-horse when Jarndyce and Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into the other world. Fair wards of court have faded into mothers and grandmothers; a long procession of Chancellors has come in and gone out; the legion of bills in the suit have been transformed into mere bills of mortality; there are not three Jarndyces left upon the earth perhaps, since old Tom Jarndyce in despair blew his brains out at a coffee-house in Chancery Lane; but Jarndyce and Jarndyce still drags its dreary length before the Court, perennially hopeless.

C. Dickens, *Bleak House.*

## I. HISTORY OF THE LITIGATION

In 1908, the predecessor of American Salt began a salt production operation southeast of Lyons, Rice County, Kansas. Salt production has continued at that location continuously since. Also beginning in 1908, commensurate with the salt production, highly concentrated brine began running "off conveyor belts, elevator buckets and through slats in drying room floors. It ponds on the surface at the southeast corner of the plant. This brine also runs off the property along the Frisco railroad to the county road east of the plant." Defendants' Trial Exhibit A. This, too, has apparently continued in varying degrees and fashions ever since. By as early as 1927, a neighboring landowner began finding his underground water supply contaminated with chlorides from the brine, and was forced to haul domestic water to his house.

The pollution continued. The Kansas Board of Health became involved in 1933. In the next year, neighboring farmers hired an attorney who protested to the American Salt plant concerning the injury from the salt runoff, and demanded damages. The salt company demurred, claiming that the pollution was not solely its fault, and detailed to the farmers the plant's new pollution control improvements that would cure any pollution problems then in existence. The year was 1935.

The pollution continued. Complaints continued. More state investigations were conducted. The salt plant, in conjunction with the state Board of Health, continued to make "antipollution improvements." The farmers bore children, raised them to adulthood, and died. Their children took over the farming operations. Land was sold, or inherited by new generations. General Host Corporation acquired Cudahy Company, including its American Salt Division. The Board of Health's responsibilities for this problem were assumed by the Kansas Department of Health and Environment [KDHE]. Irrigation plans were abandoned. Suits were threatened. The pollution continued.

This Dickensian matter was brought to this Court when a complaint was filed on

May 31, 1977. Discovery proceeded in a most unusual and contentious manner, and a pretrial order was finally filed on March 9, 1982. Defendants then filed an extremely lengthy motion for partial summary judgment on November 2, 1982, the general thrust of which was that the suit was barred by the statute of limitations. Defendants argued that since they had been polluting the underground aquifer for so long, it was no longer actionable: they had in essence acquired a license to pollute based on long-standing habit. After being deluged with heavy briefing by both sides, this Court squarely rejected defendants' "prescription by pollution" theory, and held that the continuing nature of the pollution emanating from the plant was sufficient to categorize it as a continuing nuisance causing temporary damages, giving rise to a continuing series of causes of action. *Miller v. Cudahy Co.*, 567 F.Supp. 892 (D.Kan. 1983).

The matter was called for a bench trial on March 26, 1984, and concluded on May 15. This Court handed down its opinion in the matter on August 13, 1984. *Miller v. Cudahy Co.*, 592 F.Supp. 976 (D.Kan.1984). Therein, the Court found defendants liable to plaintiffs for actual damages to growing crops in the amount of $3,060,000.00, and also found defendants liable for punitive damages in the amount of $10,000,000.00. Because of trial testimony indicating that a cleanup of the aquifer might be technologically feasible, the Court ordered the punitive damage award held in abeyance pending evaluation of potential cleanup alternatives. The Court ordered the defendants to undertake an investigation of the aquifer in conjunction with an expert to be designated by the plaintiffs, to keep the Court apprised of their discoveries, and to prepare a final report on the available scientific cleanup alternatives. Pending this, the Court retained jurisdiction over the punitive damage award. The Court certified the judgment of liability and the judgment for actual damages as a final appealable judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. After defendants' motion for a new trial had been denied, they filed notice of appeal on March 18, 1985.

However, the Tenth Circuit dismissed the appeal as premature on February 3, 1986, so the case is still before this Court in full.

Investigation towards a possible cleanup began, and a status conference was held before this Court the month after judgment was entered, on September 11, 1984. Defendants procured the expertise of Paul Roux of Roux Associates, Inc., New York, New York, ground water geologists; and of Leonard Eder of Eder Associates Consulting Engineers, p.c., Locust Valley, New York. Plaintiffs retained the services of Dr. Dan Raviv, a ground water hydrologist from West Orange, New Jersey, to monitor and evaluate what the defendants were doing. Plaintiffs had used Dr. Raviv extensively in discovery and trial, and the Court had already found his credibility high and his integrity impeccable. Almost immediately, the remedial investigation became a problem in its own right. Continual controversies arose over plaintiffs' denying defendants access to their lands for the purposes of conducting their investigations, and regarding damages resulting from such access. Progress reports were filed, but it became apparent that the ecological situation was more complex than originally envisioned. The Court had initially ordered that a final report on available alternatives be filed within eight months of the August 13, 1984 Opinion and Order, but it was not until November 20, 1985 that defendants' four volume proposed remedial action plan with supporting documents was filed. That plan, and the subsequent developments of proposed plans, will be discussed later in this Opinion.

In the meantime, numerous motions, related to the cleanup only tangentially if at all, inundated the Court. Following the Court's Order in August of 1984, the expected motions for an amended judgment or new trial, along with motions regarding costs taxed by the Clerk, were filed. But in August of 1985, defendants filed their second (though not last) motion for a new trial. From then until this past summer not a month went by without one of the parties filing a substantive motion of some form for this Court's determination: mo-

tions to compel, to quash, to strike; motions for Court appointed experts, for evidentiary hearings, for temporary restraining orders; motions to preclude evidence, to disqualify law firms, to strike affidavits. In the month of February, 1986, alone, six substantive motions, not including motions for extension of time (which inevitably engendered their own controversies), were filed for this Court's consideration. Each motion required responsive filings, some necessitated hearings, all consumed vast amounts of the parties' and the Court's time. While not intimating that the parties' filings of these motions were procedurally impermissible, the Court nonetheless found them frustrating to the original intent of retaining jurisdiction over the case for the sole purpose of considering remedial cleanup plans for potential batement of the punitive damage award. However, as will be demonstrated *infra,* the development and discussion of numerous cleanup proposals were not inhibited by these ancillary actions.

It is the Court's intention in this Opinion and Order to resolve the remaining substantive motions in this action, to evaluate the proposed remedial plans before it, and to enter a final judgment as to all parts of this case. While the Court suffers under no delusion that its action will bring to a close this Jarndycian matter, the Court ardently hopes that by at least allowing the inevitable appellate process to begin, the illusive end of this case may come closer to reality.

## II. MOTION TO DISMISS

Defendant General Host has filed with this Court a motion captioned Motion to Reconsider Denial of General Host's Motion to Dismiss. In fact, the Court's review of the voluminous filings in this case reveals that General Host has not previously filed a motion to dismiss. The defendant concedes that this is, in fact, an initial motion for dismissal.

### A. *Consideration of Defendant's Reply Memorandum*

Before the Court addresses the merits of defendant's motion to dismiss, it must first resolve a procedural dispute. In the ongoing contentious spirit of this case, plaintiffs have filed a motion to strike the defendant's reply memorandum in support of its motion to dismiss. The parties' pervasive fear that the other side might get the last word on some ancillary or tertiary matter has lead to a preponderance of the collateral attack stratagem of the "motion to strike" throughout the pendency of this case. This approach has been used no less than seven times in the post trial phase of these proceedings. *See* Dk. nos. 593 (plaintiffs' motion to strike portions of defendants' experts' report), 616 (defendants' motion to strike plaintiffs' "Observations and Objections to the Cleanup Plan"), 639 (defendants' motion to strike affidavits), 665 (plaintiffs' motion to strike defendants' memorandum in connection with the entry of a final judgment), 686 (plaintiffs' motion to strike affidavits), 687 (plaintiffs' motion to strike defendants' reply memorandum), and 696 (plaintiffs' motion to strike status report). Each of these motions has then engendered its own series of responses and replies, and required court rulings. Aside from unnecessarily cluttering the file, the absurdity of this situation is demonstrated here by Dk. no. 694 which is (there is simply no other way to put it) "Plaintiffs' reply to defendant's response to plaintiffs' motion to strike defendant's reply to plaintiffs' response to defendant's motion to reconsider denial of General Host's motion to dismiss." At times, the Court has almost required the services of a cartographer to keep straight which issue these filings address.

Plaintiffs ask the Court to strike this memorandum (the litany will not be repeated) because they allege that it was filed untimely, it is three times as long as the original memorandum in support of the motion and it addresses issues not raised in previous filings. While plaintiffs may have valid concerns, in this case it is simply too late in the day to begin policing the time and length of filings. Plaintiffs' motion is denied. The Court will now address the merits of defendant's motion to dismiss.

## B. *General Host's Connection to American Salt*

American Salt was acquired by Cudahy Company around 1930, and operated as a division of that company thereafter. In 1971, General Host acquired a controlling interest in Cudahy Company, and gained full ownership of Cudahy in 1972. Defendant claims that Cudahy was acquired by General Host mainly for its large meat packing business, and that Cudahy's salt division was only an incidental part of that acquisition. In 1984, American Salt was separately incorporated as a wholly owned subsidiary of Cudahy Company, which is a wholly owned subsidiary of General Host Corporation. Apparently, in 1985, Cudahy Company was renamed AMS Industries, Inc., although the Court has not been formally notified of this change. At no time has American Salt been an operating division of General Host Corporation.

Defendant General Host argues that, by the time it acquired Cudahy Company, American Salt had been in operation over 60 years. In 1968, state monitor wells were installed by KDHE to evaluate groundwater pollution, and the condition of the aquifer resulted in KDHE's requiring American Salt to install the east water well in 1972, which through continuous pumping since its installation has removed tons of chlorides from the aquifer. Despite this, defendant argues that it did not discover the *extent* of the pollution until after the lawsuit was filed, and then it concedes that most of what it learned was gleaned from the plaintiffs. While apparently not denying *any* knowledge of pollution prior to that time, General Host chides the Court for failing to acknowledge in its Opinion and Order that defendant was the last to discover about the pollution and its connection to the salt plant. General Host disputes the Court's imputation of knowledge of the groundwater pollution to it based on KDHE's imposition of fines for surface spills.

■ The Court will agree that General Host learned of the groundwater pollution emanating from the salt plant well after plaintiffs or their predecessors, Cudahy Company, and the American Salt plant all knew of the problem. But this fact is inconsequential. General Host cannot deny that it knew there was a pollution problem of some magnitude when it acquired the company. The fact that it was unaware of the extent of that pollution is irrelevant; no one was fully aware of the extent of the pollution until after discovery in the suit began. In fact, as this Opinion and Order will demonstrate later, much has been learned about the extent of the pollution since the trial in this case. But it is hardly a surprising proposition that ignorance of the full extent of the damage caused by one's negligent or willful acts does not afford a defense to liability for those acts.

## C. *Timeliness of Motion to Dismiss*

More cogently, General Host argues for dismissal under the doctrine of piercing the corporate veil, on the theory that the Court applied the wrong legal analysis when it originally considered General Host's liability. The Court did not originally address the corporate veil theory for the simple reason that no motion to dismiss General Host was previously before it. Before the Court can address that theory now, it finds that it must first address a procedural question.

It has already been conceded that, despite the caption of this motion, General Host has not heretofore moved for dismissal. The question therefore naturally arises whether such a motion, made almost two years after *trial* in this case was concluded, is timely. To consider that question, the Court must first determine the procedural basis on which General Host seeks dismissal. For instance, if it was moving for dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure, "lack of jurisdiction over the subject matter," timeliness would not be a concern. It is undisputed that a court may dismiss a case for lack of subject matter jurisdiction *at any time*, even on appeal. Fed.R.Civ.P. 12(h)(3). Here, defendant did not specify its grounds for dismissal. The Court, after examining all possibilities, has concluded

that the motion must be based on Rule 12(b)(6) of the Federal Rules of Civil Procedure, "failure to state a claim upon which relief can be granted." No other grounds for dismissal are applicable, and defendant's allegation that plaintiff's complaint does not aver any facts showing that General Host Corporation is liable for the plaintiffs' injuries is most appropriately characterized as a motion to dismiss pursuant to Rule 12(b)(6).

While a 12(b)(6) defense is not waived if not made in an original motion or responsive pleading, as are defenses under Rules 12(b)(2), 12(b)(3), 12(b)(4), and 12(b)(5), *see* Rule 12(h)(1), it also does not have the open ended nature of a Rule 12(b)(1) defense. Instead, its timeliness is to be considered under Rule 12(h)(2), which allows the defense to be raised at any pleading permitted or required under Rule 7(a), by a motion for judgment on the pleadings, or at trial. Technically, Rule 12(b) requires that all such motions be asserted in a responsive pleading or a motion filed in lieu of the response. Rule 12(h) only serves to preserve certain *defenses* that could have been asserted initially in a Rule 12(b) motion. After the time for filing a Rule 12(b) motion has passed, such defenses must be raised in the form of a motion such as a motion for summary judgment or for judgment on the pleadings. Wright & Miller, 5 *Federal Practice and Procedure: Civil* § 1357. However, this fine distinction is not dispositive in this case, as defendant has not filed a 12(b)(6) motion, but only seeks to raise a defense allowable under 12(b)(6).

General Host did not move for dismissal upon such grounds in its joint answer with Cudahy Company. It did deny that the American Salt plant had ever been maintained at the direction of any defendant other than Cudahy, which is consistent with its corporate veil argument here. Dk. no. 5, ¶ 9. Additionally, it alleged that all claims for relief set forth in plaintiffs' complaint failed to state a cause of action upon which relief could be granted against either defendant. Dk. no. 5, ¶ 35. But, although it asserted the defense then, it did not then move for dismissal upon those grounds.

Nor has defendant since moved for dismissal on such grounds in any motion for judgment on the pleadings, as permitted by Rule 12(h)(2). Finally, defendant did not make such a motion for dismissal at trial.

■ The Court construes Rule 12(h)(2) as limiting the time for raising such a defense to the enumerated occasions. While that subsection is considerably more permissive than Rule 12(h)(1), it can not be construed to allow such defenses to be raised at any time. If that were so, then the reason for separating out the provisions in Rule 12(h)(3), and specifying that such defenses may be raised *"Whenever,"* would not make sense. Instead, the Rules seem clear that the defenses specified in Rule 12(h)(1) must be raised in the initial motion or response, the defenses specified in Rule 12(h)(3) may be raised at any time, and the defenses specified in Rule 12(h)(2), while not required to be raised initially, cannot be raised indiscriminately but only on the specified occasions. The occasions specified in Rule 12(h)(2) are generous and liberal, allowing such defenses to be raised at any time up to and including trial. But the separate enumerations of 12(h)(2) and 12(h)(3) would indicate to this Court that a motion to dismiss for failure to state a claim upon which relief can be granted cannot be made at any time. More specifically, it cannot be made after trial. Because defendant's motion was not made on one of the allowable occasions, the Court finds the motion untimely.

Although defendant did not discuss Rule 12(h)(2) in any filing connected with this motion, the Court notes that it did discuss it in Dk. no. 706, which deals with a separate issue. There, defendant asserted that such a motion can be made at any time prior to the entry of final judgment. Defendant apparently arrived at this conclusion by running together the "time of trial" and the "time of entry of final judgment." In a normal case, the difference between these two times would be slight. This is not a normal case. There will be a difference of almost three years between the conclusion of trial and the entry of final judgment. In such an instance, the fine

line must be drawn, and the Rule clearly draws it at the time of trial as the latest allowable time. Defendant's motion was not made then, so it was not made timely.

Cases under the Rule, and commentators on it, discuss timing of Rule 12 motions in terms of the time for *filing* a Rule 12(b) motion, and the time for *preserving* a Rule 12(b) defense pursuant to Rule 12(h). The Court has found few cases that discuss the instance where a Rule 12(b) defense is raised timely, but a motion for dismissal on those grounds is not made until after trial. The issue arose on appeal in *Smith v. Atlas Off-Shore Boat Service, Inc.*, 653 F.2d 1057, 1060 n. 1 (5th Cir.1981), where the Circuit Court allowed the defense of failure to state a claim to be asserted on appeal because, while Atlas did not specifically raise the issue at trial, it "sufficiently alerted the trial court to its contention that there is no claim ... [and] adequately raised the issue to preserve it for appellate review." *Id.* Likewise, in *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 479–80 (5th Cir.1984), the Fifth Circuit again noted the rule that the defense that a complaint fails to state a claim upon which relief can be granted must be raised before the completion of trial, but noted that if "the defense is *actually* raised in the trial court, it is not waived by failure to assert it in a specific manner." *Id.* (emphasis added). In *Brule v. Southworth*, 611 F.2d 406, 409 (1st Cir.1979), the court determined that defendants' argument, though presented as jurisdictional, was in reality premised on the contention that plaintiffs had failed to state a claim upon which relief could be granted, and that it was "fatal that defendants never asserted any such ground in the district court, either before or during trial." *Id.* The court noted that the grounds could have been asserted and therefore preserved "by means of a directed verdict, judgment on the pleadings or the like." *Id.* at n. 4. See also *Sartin v. Commissioner of Public Safety*, 535 F.2d 430 (8th Cir.1976).

Based on this authority, the Court must conclude that merely raising the defense in an answer is not sufficient of itself to preserve the defense so that a motion to dismiss based on that defense can be raised at *any time.* While the above cited cases all deal with cases on appeal, it must be conceded that in the normal course of things, a case goes to appeal immediately after trial. The instance here, where the trial court has retained jurisdiction for over two years after trial, merely to fashion the form of the damages awarded, is highly unusual to say the least. The Court points out that it retained jurisdiction for one specific purpose only: to evaluate a potential cleanup to be implemented in lieu of some or all of the punitive damages award. The Court certified the balance of the decision, including the finding of liability against General Host, for appeal. Although the Tenth Circuit declined to exercise appellate review until the entire case was before it, that does not change the finality of this Court's decision. It is immaterial that the trial court still has jurisdiction over the matter; trial has been held, liability established, and judgment entered. The interests of judicial finality are the same in this instance as they are in the case of appellate review. Absent something more than a bald recital in the defendants' answer of the defense of failure to state a claim upon which relief can be granted, this Court is convinced that the weight of authority is overwhelming that such a motion, made after trial, is made too late. Therefore, the Court must conclude that the Federal Rules of Civil Procedure no longer permit it to entertain such a motion.

Defendant General Host's motion to dismiss is denied as untimely plead.

## III. MOTION FOR A NEW TRIAL

### A. *Procedural Posture of the Case*

On August 12, 1985, eight years after this case was filed and a year and a half after it was tried, defendants filed a motion with this Court seeking a new trial pursuant to Rules 60(b)(2) and 60(b)(6) of the Federal Rules of Civil Procedure. The ground asserted for their motion was "newly discovered evidence," evidence they were later to assert was "practically con-

clusive." Dk. no. 573, p. 31. As had become par for this action, the motion was hotly contested and exhaustively briefed by both sides.

On January 31, 1986, the Tenth Circuit Court of Appeals granted defendants' motion to dismiss the appeal in this case as premature. The appeal had been taken pursuant to this Court's order of August 13, 1984, certifying as final appealable orders the determination of liability and the judgment for actual damages, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The Circuit, however, held that this Court's judgment was not a final judgment under 28 U.S.C. § 1291. *Miller v. Cudahy,* No. 85–1450 (10th Cir., *unpublished,* January 31, 1986).

Because of the Circuit's ruling, the defendants' motion for a new trial pursuant to Rule 60 was procedurally premature. Therefore, on February 10, 1986, they filed a motion for an evidentiary hearing to revise and amend the findings of fact and conclusions of law issued by this Court on August 13, 1984, or, in the alternative, for a new trial, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. They seek essentially the same relief sought in their earlier new trial motion. This motion was filed only to restate, on procedurally correct grounds, their request for that relief. Defendants in that motion incorporate by reference all of their earlier "new trial" filings. Therefore, the Court will consider the two motions and their progeny filings together.

**B.** *Standards for Motions for New Trial or To Revise and Amend*

1. *Federal Rules of Civil Procedure*

Rule 54(b) provides as follows:

**Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties *shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.* (emphasis added).

It is clear that under this Rule the Court retains the power to alter decisions until final judgment is made in a case. *Paramount Pictures Corp. v. Thompson Theatres,* 621 F.2d 1088, 1090 (10th Cir.1980); *United States v. Desert Gold Mining Co.,* 433 F.2d 713, 715 (9th Cir.1970). But the real question is not if the Court can alter rulings, but whether the Court should. While Rule 54(b) implicitly allows revisions, it does not address under what circumstances or for what causes such revisions should be made. Considering that this action was a trial to the court and not to a jury, the Court finds that in this instance a motion to alter or amend is essentially a motion for a new trial. Therefore the Court finds that its consideration of this issue should also be governed by Rules 59 and 60 of the Federal Rules of Civil Procedure, which provide in relevant part:

**Rule 59. New Trials; Amendment of Judgments**

**(a) Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues ... (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

**(b) Time for Motion.** A motion for a new trial shall be served not later than 10 days after the entry of judgment. **Rule 60. Relief from Judgment or Order**

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); ... (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time....

Because defendants timely filed a new trial motion following the August, 1984 entry of judgment, and because the instant motion was filed within ten days of the Circuit's ruling, the Court finds that none of defendants' motions now under consideration are time barred. Because this action was tried to the Court, all motions are being considered in conjunction for the relief the defendants seek, procedural distinctions aside. Motions for new trial and for reconsideration are closely related, so the movants should be granted whatever relief their motion shows them entitled to. *United States Gypsum Co. v. Schiavo Brothers, Inc.,* 668 F.2d 172 (3rd Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). The Court notes that defendants' new trial motion of August 12, 1985, sought relief pursuant to Rules 60(b)(2) and 60(b)(6).

### 2. *Case Law*

Motions for new trials, relief from judgment, or to alter or amend the court's findings and conclusions are directed to the discretion of the court. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980); *Clarke v. Burkle,* 570 F.2d 824, 830 (8th Cir.1978); *Kargman v. Sullivan,* 582 F.2d 131, 135 (1st Cir.1978); *Ope Shipping, Ltd. v. Underwriters at Lloyds,* 100 F.R.D. 428,

431 (S.D.N.Y.1983). The standard of review for a district court's decision on these matters is abuse of discretion. *Howard D. Jury, Inc. v. R & G Sloane Mfg. Co., Inc.,* 666 F.2d 1348, 1352 (10th Cir.1981); *Washington Mobilization Committee v. Jefferson,* 617 F.2d 848, 850 (D.C.Cir.1980). Motions seeking new trials or relief from judgments on the basis of newly discovered evidence seek extraordinary relief and will be granted only in exceptional circumstances when the requirements are strictly met. Such motions are disfavored. *Dabney v. Montgomery Ward & Co., Inc.,* 692 F.2d 49, 52 (8th Cir.1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983); *Goland v. Central Intelligence Agency,* 607 F.2d 339, 370 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Link v. Mercedes-Benz of North America, Inc.,* 618 F.Supp. 679, 693 (E.D.Pa.1985), *aff'd in part, vacated in part,* 788 F.2d 918 (3rd Cir.1986); *Swift Chemical Co. v. Usamex Fertilizers, Inc.,* 490 F.Supp. 1343, 1350–51 (E.D.La.1980), *aff'd,* 646 F.2d 1121 (5th Cir.1981), *rehearing denied,* 650 F.2d 282 (5th Cir.1981); *Wilson v. Fonte,* 82 F.R.D. 632, 634 (E.D. Pa.1979).

The law is well settled that to reopen trial proceedings for newly discovered evidence, three requirements must be met. First, the evidence must have existed at the time of trial, but not have been known to the movant. Second, the evidence must be such that it could not have been discovered in time to present it at the original proceedings by the exercise of due diligence. And third, the evidence must be such that it would probably have produced a different outcome had it been presented initially. *Branca v. Security Benefit Life Insurance Co.,* 789 F.2d 1511 (11th Cir.1986); *Equal Employment Opportunity Commission v. Rath Packing Co.,* 787 F.2d 318, 331 (8th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986); *Hoyt R. Matise Co. v. Zurn,* 754 F.2d 560, 568 n. 14 (5th Cir.1985); *Ope Shipping, Ltd.,* 100 F.R.D. at 432; *Champion Spark Plug Co. v. Gyromat Corp.,* 88 F.R.D. 526 (D.Conn.1980), *aff'd* 636 F.2d 907 (2d Cir.1981). These three factors will

govern the Court's consideration in this case.

■ For this matter, the Court would particularly emphasize two of those factors. Of preeminent concern in evaluating defendants' "newly discovered evidence" is whether that evidence, by the exercise of due diligence, could have been discovered in time for trial. A judgment may not be set aside, or in this case modified or amended, on the grounds of newly discovered evidence where that evidence is the type which with due diligence the defendants could have discovered in time for the original trial or proceeding. *Music Research, Inc. v. Vanguard Recording Society, Inc.*, 547 F.2d 192 (2nd Cir.1976).

■ Even if the evidence is such that it could not by due diligence have been discovered, to support a motion for a new trial the evidence must be material to the issues and must be of such a nature that it would probably change the outcome. *Stridiron v. Stridiron*, 698 F.2d 204 (3rd Cir.1983). While this factor is most generally applied to exclude evidence that is merely cumulative or impeaching in nature, it goes beyond that. New evidence, even if genuinely new and material, regarding a relevant aspect of the trial subject matter and regarding an issue that was not presented at the trial or that would have cast evidence presented at trial in a significantly different light, does not thereby automatically warrant a new trial. Instead, the Court must look at the new evidence in light of the total evidence presented at trial. Where the weight of the evidence presented at trial is so overwhelmingly in support of the initial verdict that the introduction of this new evidence, probative and significant though it may be, would still not have changed the final outcome, then a new trial is not justified. "The strength or weakness of the evidence against the defendant is an important and often decisive factor in judging the new evidence supporting a motion to vacate, because the fundamental purpose of the Rule 60(b) motion is to prevent the judgment from becoming a vehicle of injustice." *United States v. Walus*, 616 F.2d 283, 288 (7th Cir.1980).

In a matter that was tried to a jury, the Court perhaps must be careful in making such a determination as to the outcome altering nature of this new evidence, and give the movant the benefit of any doubt. But in a matter such as this which was tried to the Court, the Court can assess even the closer questions, and if it determines that the introduction of this newly discovered evidence, viewed in the best possible light, would still not have changed the verdict as to liability or damages, then it need not order that a new trial or hearing be held.

## C. *Newly Discovered Evidence: Proffered*

In light of these standards governing the exercise of the court's discretion as to whether to grant a new trial or hearing to alter or amend its original findings of fact and conclusions of law, the Court will now review the proffered "newly discovered evidence." Defendants assert that this evidence is relevant to punitive damages, equitable relief, liability and actual damages; in short, to everything. The Court will not add to the already lengthy nature of this opinion and order by reviewing the exhaustive findings and conclusions made initially in its Opinion, reported at *Miller v. Cudahy Co.*, 592 F.Supp. 976 (D.Kan.1984).

Defendants offer a wealth of new evidence, which the Court shall attempt to arrange in some form of topical grouping. The Court is repeating here only the evidence proffered by defendants. It should be emphasized that this recitation is not to be taken as the Court's acceptance of these "facts" as proven. Plaintiffs have not had an opportunity to conduct discovery of their own on these issues, nor to cross examine defendants' witnesses and experts or evaluate defendants' reports. Should a new trial or hearing be held the facts found there may differ from this proffer. The Court only examines defendant's "new evidence" to determine if, taking all of their assertions as true, the evidence would warrant a new trial.

Defendants assert that their testing has revealed several hitherto unknown aspects of the aquifer. Among these are that the

rate of groundwater flow and recharge rate is much slower than was believed at trial. Additionally, defendants have discovered that sodium pollution, rather than chloride pollution, from the brine presents the major obstacle to an environmental cleanup. Due to a phenomenon known as the Sodium Adsorption Ratio [SAR], the pollution will take much longer to clear. The problem presented by SAR is that the clay particles surrounding the aquifer absorb sodium from the polluted water; then, after all of the polluted water will have hypothetically passed and clean water is flowing through the aquifer, the clay would release sodium into that water, re-polluting the water. Because of this, it is not sufficient for all of the presently polluted water to flow through the area (assuming no further pollution, an assumption not warranted by any facts at this time); instead, two to three times that amount of water must flow past the sodium laden clay in order to thoroughly "rinse" out the pollution. Because the aquifer is moving much slower than originally believed, and because much more water will be required to flow through the aquifer to cleanse it than originally believed, defendants assert that the aquifer would not naturally cleanse itself of the salt plume in twenty to thirty years as suggested at trial. In fact, defendants suggest to this Court that it would take two to three hundred years for such a cleansing to occur!

As a corollary to the reduced recharge rate of the aquifer, defendants assert that the aquifer, even in an unpolluted state, would not support irrigation by all of the plaintiffs. They direct the Court's attention to the recently reduced irrigation permit allowances by the Big Bend Groundwater Management District. Under these restrictions, plaintiffs could not all obtain permits to irrigate the affected land even if good water existed. Defendants further assert that, had plaintiffs all been irrigating, in light of the aquifer's low recharge rate the aquifer would have been severely mined by now, and perhaps permanently damaged. Defendants further assert that more accurate mapping of the plume has revealed that some of the plaintiffs' land is not even affected by the underground water pollution, and that some of the plaintiffs' land has access to good water for irrigation. Defendants assert that these facts go to the actual damages awarded at trial.

Defendants allege to have discovered another plume "upstream" from this one, emanating from an old Carey salt mine. Although this plume does not now join with the plume which is the subject of this dispute, defendants attempt to imply that the plumes may once have been connected (without explaining how they could have once been connected and are not now, since both flow in the same direction). Defendants therefore assert that American Salt may not be solely to blame for the instant plume. They further assert that the pumping of one of their wells is preventing this plume from spreading further, and congratulate themselves for this without showing that it has any relevance to the present suit.

Defendants assert that recent testing has shown that, contrary to the finding made by this Court following trial, their brine fields are not leaking. The Court would note that plaintiffs hotly dispute this "finding," as they did at trial. As will be demonstrated below, evidence offered during the remedial phase of this case, not the least of which was from Kansas Department of Health and Environment, continues to support the Court's original finding that the brine fields have been leaking and are continuing to leak.

Defendants assert that, based on the slow flow rate of the aquifer and the presence of an intercept well on their property, any chlorides that escape from the plant will be (and have been) intercepted before they reach the aquifer lying under any of the plaintiffs' land. Therefore, they are not now causing any pollution to plaintiffs' property.

These are the meat of defendants' proffered "new evidence." Again the Court would emphasize that this "evidence" has not been subjected to plaintiffs' scrutiny, and the facts are therefore not proven facts. The Court will now evaluate them in

329

light of the earlier listed standards for granting a new trial motion.

## D. *Newly Discovered Evidence: Evaluated*

### 1. *Groundwater Management District's Permit Requirements*

■ Initially, the Court dismisses consideration of the recently revised Big Bend Groundwater Management District's permit requirements. That revision occurred after the trial in this matter, and as such did not exist at the time of trial. "Compelling policies of finality require that in the absence of exceptional circumstances, events occurring after a trial on the merits cannot justify the reopening of a judgment." *County of Trinity v. Andrus,* 77 F.R.D. 29, 30 (E.D.Cal.1977). Defendants argue that this rule does not apply here because the revised regulations only reflect the realities of the aquifer, realities which existed at the time of trial. The Court will consider the "newly discovered" aquifer characteristics shortly. The Court notes, however, that at trial one of the factors considered in the damage award was that plaintiffs could have obtained permits to irrigate *but for* the fact that the water was unsuitable for irrigation (Kansas law does not allow a permit to be granted for irrigation unless it will actually be put into use; where the water cannot be used, as here, no permit will be granted solely for that reason).

Had plaintiffs in fact been given irrigation permits and begun to irrigate, and had such irrigation in fact so seriously threatened the aquifer as to cause the groundwater management district to take action, the Court cannot speculate on what action the Groundwater Management District would have taken. It is possible that they would have revoked some of the farmers' irrigation permits, but it is just as possible that they would have revoked some of American Salt's water permits, especially since American Salt holds the lion's share of the area's permits. The fact remains that, at the time of trial, plaintiffs could have obtained permits for irrigation if not for the pollution. That permit requirements were later

changed so that, today, they could not obtain such permits even were the water pure, is immaterial.

### 2. *Ancillary Motion to Revise or Amend: Lost Crop Profits*

The Court should note at this point that defendants disagree with some of the assertions just made regarding plaintiffs' ability to obtain irrigation permits. They have, in fact, filed a "Motion to Revise or Amend the August 13, 1984 Opinion to Dismiss the Claims for Lost Crop Profits of those Plaintiffs Who Have No Water Permits to Irrigate Their Lands." Dk. no. 697. This motion to revise or amend is separate from the motion to revise or amend which the Court has been discussing (Dk. no. 604), and from the motions for New Trial, or in the alternative, to Revise or Amend which defendants have filed previously (Dk. nos. 526, 462). Defendants assertion in the instant motion, Dk. no. 697, is that the plaintiffs, with the exception of three who had secured water permits, cannot recover for lost crop profits due to their inability to irrigate because they had no permit, and therefore no legal right, to irrigate.

Defendants present the Court with a detailed review of Kansas law on water rights. They assert that plaintiffs could have acquired a "vested right" to water prior to July 1, 1980, if they had made "continous application for water for beneficial use since on or before June 28, 1945." Dk. no. 697, p. 5, citing K.S.A. § 82a–701(d). Of course, as this Opinion has previously demonstrated, pollution of the water which prevented any beneficial use has existed since well before 1945. Defendants unsurprisingly do not mention this. They also assert that plaintiffs could have acquired an "appropriation right" through the permitting process. Defendants do not actually deny that use of the water is necessary to obtain and maintain a permit. They do assert with great aplomb that neither state law or groundwater management district rules and regulations "require a water quality test as a condition for obtaining a permit." Dk. no. 697, p. 6.

They further suggest that all plaintiffs needed to have done was file an application and obtain a permit while water rights were still available and then timely request extensions for perfecting the permit, i.e., putting the water to beneficial use. Defendants assure the Court that plaintiffs could have obtained an exception to the rule that water rights not used for three consecutive years are forfeited, based upon a showing of due and sufficient cause (pollution). By following these steps, defendants conclude, "[p]laintiffs would thereby have secured their right to use the water as soon as it was clean." Dk. no. 697, p. 10. Of course, these are the same defendants who initially suggested to plaintiffs and to this Court that the water would not be clean for two hundred years. *See* V. REMEDIAL ACTION PLANS, *infra.*

From a theoretical standpoint, plaintiffs may have been able to obtain some type of water permits by following the contorted process defendants suggest. But this interesting legal theory has no application to the real world in which plaintiffs live. They are landowners, not barristers. They only wish to spend their time farming, not engaging in the testing of novel legal theories. State agencies such as the Big Bend Groundwater Management District and the State Board of Agriculture, Division of Water Resources have suggested to the Court that one could not obtain a permit for water unless he actually were to use the water. *See* Transcript of June 2, 1986 hearing, pp. 46, 50. Of course, this water is unusable. If this interpretation by the state agencies is not technically correct, assuming without deciding that defendants' suggestion is a theoretical possibility, the plaintiffs are not to be faulted for relying on that understanding. Plaintiffs did not seek water permits because they could not use the water, even if they had permits. To conclude therefore that they are estopped or precluded from receiving damages for their inability to irrigate is inequitable; it turns the law on its head. Speaking of the Kansas Water Appropriation Act, the Kansas Supreme Court said:

Under this declaration and other provisions of the act we now approach [questions concerning water rights] upon the basis of the interest of the people of the state without losing sight of the beneficial use the individual is making or has the right to make of the water. *Unused or unusable rights predicated alone upon theory become of little if any importance.*

*State, ex rel., Emery v. Knapp,* 167 Kan. 546, 555, 207 P.2d 440 (1949) (emphasis added). Defendants' suggested course of conduct may make sense in an Alice-in-Wonderland world; it makes no sense in ours.

Further, plaintiffs demonstrate that defendants' intervening cause argument—that the intervening cause of the failure of plaintiffs to obtain water permits for irrigation precludes their right to recover for loss of irrigated crops due to the pollution—is fatally flawed. Defendants' argument presupposes that there is no relationship between the pollution and the failure of plaintiffs to obtain permits. But testimony received has demonstrated that plaintiffs have not applied for or received permits because the pollution prevented use of the water. The failure to obtain permits is not a cause of plaintiffs' inability to irrigate; both the inability to obtain permits and the inability to irrigate are a result of defendants' pollution of the aquifer. Evidence from plaintiffs and state officials has suggested, and the Court so finds, that it would have been futile for plaintiffs to apply for irrigation permits so long as the water was unfit for irrigation. Therefore, plaintiffs failure to apply for permits is excusable and does not bar their revovery for lost crop profits.

Defendants argue that plaintiffs' claim of futility is "totally spurious because the filing of a permit application is not 'futile' but a requisite first step to obtaining a water right." Dk. no. 697, p. 10. This argument is non-responsive. Filing of a permit application is a requisite first step to obtaining a permit, but when other circumstances will bar the issuance of a permit, and those circumstances are known initially, the filing for a permit becomes *both* a requisite first step and a futile act.

Plaintiffs' futility argument is not totally spurious, but defendants' tortuous dance around the law and the facts is.

■ Defendants' motion regarding lost crop profits is denied. Plaintiffs' inability to obtain water permits augments their claim against defendants; it does not bar it. That Big Bend has subsequently revised the allowable amount of water permits available due to discovering the reduced aquifer recharge rate likewise does not bar plaintiffs' action against defendants. Any difficulties which plaintiffs might encounter now in seeking to obtain water permits is immaterial to their previous failure to apply for permits. They did not apply when permits were available because defendants' pollution prevented permits from being obtainable. The reduced permit allowances are not properly considerable as "newly discovered evidence," and do not operate as a bar to plaintiffs request for damages against defendants. The Court will now examine the remaining proferred newly discovered evidence.

### 3. *Due Diligence*

The remaining "newly discovered facts" all seem to be of the nature of facts that did exist at the time of trial. Regarding these, defendants boldly assert that these facts are practically conclusive in themselves, and chide the Court that "[t]he only reasonable solution is for the Court to recognize that the *real facts are the facts*, regardless of when they were discovered." Dk. no. 605, p. 5. Defendants cite no authority for this proposition, which is hardly surprising since, despite the appealing sound of the assertion, there is no authority for that statement as constituted. Even assuming that these "facts" could survive plaintiffs' scrutiny and emerge unscathed as the "real facts," and even assuming that these "real facts" were indeed conclusive in and of themselves, that is hardly the starting point in a motion for a new trial or a motion to alter and amend the court's findings. Instead, the initial question must be, could these alleged facts have been discovered by defendants' exercise of due diligence in time for the trial? Or, put another way, how many of these alleged facts could defendants not have discovered in time for trial, as opposed to how many they just did not discover?

Defendants certainly did not lack for time. This case, filed nearly ten years ago, was in discovery for seven years before it was finally called to trial. Instead, it is very clear to this Court, which has watched the tortuous course of this case unfold, that defendants made a policy or strategy decision not to test the aquifer, not to investigate the complaints, not to inspect the damage; in short, to do nothing but ignore the entire matter. This course of inaction was followed despite requests by KDHE to test, and despite fines and the threat of further, more serious action by KDHE. It was done despite the pendency of this suit, and despite the sordid history spanning a half a century of complaints by neighboring land owners and state agencies regarding pollution. Defendants' strategy was to pooh-pooh the allegations that they were polluting and to pretend that there was nothing to be alarmed about. Considering that this was the company line not only for the seven years of discovery in this case, but for the fifty years of plant operation, the Court will not now hear them say that they could not have discovered what the "real facts" of the aquifer were until after this suit. They made a conscious decision not to investigate the "real facts." They must now live with that decision.

Defendants deny that they had seven years to investigate this matter. They instead plead that they had no reason to look for this type of evidence until this Court's order of June 21, 1983, *Miller v. Cudahy Co.*, 567 F.Supp. 892 (D.Kan.1983). Defendants pretend that the 1983 order "radically altered" this litigation. Dk. no. 527, p. 25. The Court's opinion of this claim of "surprise" is unprintable. The only thing that was radically altered by the 1983 order was that defendants were finally disabused of their notion that their beloved statute of limitations defense was the panacea to all their legal problems. As previously mentioned, defendants believed (or hoped) that their "prescription by pollution" theory

would prevail; that if they polluted the environment long enough, it was theirs; and that they could not be called to account for what they did to it. The Court's 1983 order refused to accept this base proposition. It is apparent to the Court that defendants continue to hold fast to this favorite son principle; but this Court continues just as strongly in its abhorrence to that line of defense.

In fact, the "radical change" wrought in this matter by the 1983 order was not so radical as to suddenly require testing of the aquifer to determine the damage done, whereas before none had been required. This action was brought initially alleging pollution of the aquifer, and damage to the plaintiffs' ability to irrigate as a result thereof. While there were varying arguments of permanent or temporary damages, which the 1983 order resolved, by no reasonable legal theory could the pre-resolution of that matter be regarded as putting the case in a posture where the condition of the aquifer which was alleged to be polluted was immaterial to the case.

Even were the Court to accept defendants' proposition that the defendants did not know it was necessary to test the aquifer until after the 1983 order, the Court could still not find that defendants are excused from not discovering this evidence prior to trial; that they could not have discovered it with the exercise of due diligence. The order "radically altering" the case was handed down on June 21, 1983. The case was called for trial on March 26, 1984, nine months later. Defendants contend that these nine months were insufficient to conduct the necessary discovery. They admit that they did not seek a continuance for the purpose of obtaining sufficient time to conduct this suddenly necessary investigation, but seek to excuse their failure on that account by complaining that the Court would not have allowed another extension in this already protracted matter then anyway. Whether the Court would have granted or denied a motion for continuance to allow additional discovery is speculative; what is certain is that defendants did not request continuance. If, as they claim, the 1983 order had indeed "radically

altered" the course of this litigation, then seeking such a continuance would have been a natural, almost necessary, consequence. That they did not then seek such a continuance is perhaps indicative of the fact that they did not then truly believe that the litigation had been that altered. At any rate, the Court finds it passing strange that, after seven years of discovery defendants were too concerned about the protracted nature of the suit to seek an extension of a few months; but now, after ten years of proceedings, they are not so concerned but that they seek a new trial, which would cause at least another year of activity at the district level.

Moreover, the Court is unpersuaded that those nine months were so fleeting as to not warrant even beginning an investigation. The Court handed down its judgment in this case on August 13, 1984. On September 11, 1984, a status conference was held with the parties concerning the development of a remedial investigation. At that time it was envisioned that the results of this investigation would be presented to the Court by April 1985, as ordered in the August ruling ("a final report ... shall be filed with the Court within eight months of the date on which this Opinion and Order is filed." 592 F.Supp. at 1009.). Although the defendants now plead that the nine months between the 1983 order and the commencement of trial were too brief to warrant even beginning an investigation, they did not complain the next year when instructed to complete an entire remedial investigation within eight months. In fact, the development of the investigation later required them to seek extensions of time, but their final *four volume* report was filed with the Court on November 20, 1985, fourteen months after the status conference.

■ Thus, even if the Court were to accept defendants' argument that testing of the aquifer was not required until after the 1983 order, and even if the Court were to accept defendants' excuses for not seeking an extension of time in which to complete this testing, the Court could still not find that defendants were excused from

the due diligence requirement to discover the facts prior to trial. Even then, sufficient time existed to begin an investigation. Defendants instead chose not to investigate. What their strategy was, whether hoping for an appellate resurrection of the "prescription by pollution" theory, or whether fearing that any facts uncovered could only hurt their cause, the Court can not divine. But it is painfully clear that the defendants, without excuse, made a decision not to investigate the damage to the aquifer. Not until forced by the Court, under threat of a ten million dollar punitive award, did they begin a remedial investigation. If the facts of that investigation have yielded evidence they believe would have been helpful at trial, that is unfortunate for them. "[D]efendant's desire to introduce additional evidence after losing the case [does] not constitute a proper ground for granting a new trial." *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir.1978).

Adopting defendants' theories would insure that no case was ever final; a party could drag its discovery out piecemeal and thereby require continual retrials. Even if it had no hope of winning, it could hope to wear its opponent down. Indeed, it is not surprising that defendants have attempted this approach; American Salt threatened plaintiffs years ago that if suit was filed "the money and lawyers available to American Salt would enable it to drag any litigation out for years, bankrupt [the plaintiffs] in the process, and take [their] land." *Miller*, 592 F.Supp. at 996. That threat has come close to becoming a reality. The disparity of resources between the parties has been a constant problem in this suit. It has resulted in the defendants being able to make voluminous filings of briefs, arguments and research far in excess of what the plaintiffs can match. "The defendants have seemingly limitless resources for the filing of written motions, memoranda, etc., in this case; their resources for so doing are far greater than those of the plaintiffs and their attorneys." Dk. no. 609, p. 2. At recent hearings, plaintiffs' counsel has made it clear that her clients have severely limited, for financial reasons, what additional legal action she could take.

The Court is sympathetic to the plight of the plaintiffs, who, though small farmers, have been forced to pay the costs of this action for ten years and have so far gained no remuneration from it. Any additional delays sought by the defendants must be balanced against the increasing chance that rising costs to the plaintiffs may force them to abandon their action, especially in light of defendants' earlier threat to do just that. This Court will not tolerate that type of litigation strategy. The Court finds that there was ample opportunity to discover this evidence during the years of discovery, and that defendants' failure to do so warrants a denial of their motion now. *McClean v. Alexander*, 449 F.Supp. 1251, 1263 (D.Del.1978), *rev'd on other grounds*, 599 F.2d 1190 (3rd Cir.1979).

Due diligence going to a new trial motion is a factual determination. The Court finds that had defendants exercised due diligence, they could have discovered this evidence in time for trial. Their failure to exercise due diligence requires that their new trial/relief from judgment/amend findings of fact and conclusions of law motions be denied.

### 4. *Outcome Altering Effect of New Evidence*

■ Although not necessary to the resolution of defendants' motions, the Court further determines that, even had defendants exercised due diligence, their motion would not be granted. This Court sat as the fact finder in the original proceedings and heard the wealth of evidence presented there over the course of thirty-three days of trial. The weight of evidence against the defendants and in support of the final verdict was overwhelming. Examining the proffered "new evidence," even without benefit of plaintiffs' critique, the Court is persuaded that nothing is proffered which would have changed the verdict as to liability or punitive damages. The evidence could only possibly go to actual damages. While recognizing that the Tenth Circuit's order in this case leaves the entire verdict, including actual damages, open to revision, this Court considered the actual damages

phase of the suit to be over when the trial concluded in May of 1984. Nothing defendants have shown the Court now persuades it that its decision was wrong, or that the case should be reopened.

### 5. *Due Process Considerations*

Defendants warn the Court that an evidentiary hearing must be held because it would "avert any due process problems which might arise if the Court failed to afford the parties herein the opportunity to fully and fairly develop and present the evidence which has been discovered." Dk. no. 605, p. 6. The Court agrees more with plaintiffs, who remind us that despite defendants' "deep rumblings" about due process, due process is governed by the rules and authorities with which this Court has already evaluated defendants' motions.

■ Due process does not require that parties be allowed to present any evidence that they want to, at any time, regarding any subject matter, in complete disregard to the established rules of evidence and civil procedure. It only requires that the party suffering a loss be given an opportunity to be heard "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). To suggest that this Court has not afforded defendants a meaningful opportunity to be heard is laughable. In addition to a very lengthy trial, numerous hearings have been held in this matter, some of them as long as a normal trial. At each of these hearings, defendants have been given full opportunity to present evidence and to examine plaintiffs' evidence (the sole exception being the very last hearing held in this matter at which neither plaintiff nor defendant were allowed to present evidence, but where the Court received in open court the reports of state agencies' evaluations of the proposed plans). Literally thousands of pages of memoranda have been filed by defendants. The Court has noted at some of these hearings that, if anything, this case was being "due processed to death." For the defendants to suggest now, after ten years of activity, months of trial time,

and volumes of pleadings that due process is being denied them is perhaps one of the most outlandish claims this Court has ever heard. If this matter has any problems, denial of due process certainly is not one of them.

### 6. *Any Other Reason for a New Trial*

In addition to seeking relief pursuant to Rule 60(b)(2), "newly discovered evidence," defendants also seek a new trial pursuant to Rule 60(b)(6), "any other reason." This rule is not an open ended invitation to seek a new trial for any reason, but is only designed to allow the Courts to do justice when equity demands, but the Rules otherwise do not provide authorization. This rule is especially "not a substitute for a motion for a new trial, particularly when it is grounded upon evidence which could have been discovered and timely presented through the exercise of due diligence." *Inter Financing Exchange S.A. v. Bartlett & Co., Grain*, 659 F.2d 1320, 1321 (5th Cir.1981). No other reason has been shown to the Court why a new trial or the functional equivalent is warranted. Therefore, application of this Rule is not justified.

A motion for new trial is an extraordinary request, directed to the discretion of the Court. Defendants have not begun to meet their burden of demonstrating that the proceedings should be reopened. The Court has not been shown that justice requires it. Indeed, justice requires that plaintiffs not be caused to pay for defendants' conscious decisions not to investigate earlier. The motions shall be denied.

## IV. COSTS, EXPENSES AND FEES

On February 6, 1986, plaintiffs filed a motion for the award of Costs, Expenses and Fees incurred in conjunction with the remedial phase of this case (Dk. no. 602). They filed an itemized list of expenses for which they sought reimbursement. Receipts verifying most of the expenses for such reimbursement were attached to their motion. Because the case was in the midst of the remedial hearings at that time, the Court postponed ruling on plaintiffs' mo-

tion, anticipating that any expenses of that nature which they had incurred they were likely to continue incurring. This presumption has proven accurate. Plaintiffs filed addendums to that motion, setting out additional like expenses incurred, on April 23, 1986 (Dk. no. 654); May 5, 1986 (Dk. no. 658); and May 9, 1986 (Dk. no. 659). The categories of expenses for which reimbursement is sought are transcripts, witness fees (including those expenses denominated as "Subpoena" in Dk. no. 659), laboratory expenses, expert expenses, telephone expenses, copying expenses, postage, attorneys' travel expenses and attorneys' fees.

## A. *Background*

Before discussing the relevant merits of each requested item, the Court first emphasizes the unique nature of the proceedings which resulted in these expenses. All costs requested are for post trial proceedings, unlike the vast majority of reported cases dealing with costs which involve pretrial expenses only. The development and presentation of various plans that defendants have offered has proven to be a complicated and controversial matter, as this opinion will discuss later in some detail. The plaintiffs have incurred substantial additional expense in the course of this matter: post trial filings made have been nearly as voluminous as the pretrial fillings (which themselves ran into hundreds of docket entries and thousands of pages). The Court has attempted to make it clear throughout the long and contentious course of this remedial phase that the plaintiffs had *already won* the case, and that the Court felt that they should not be further penalized or prejudiced by post trial hearings or expenses collateral to defendants' development of the remedial action plan. Neither plaintiffs' verdict nor their their damages were in jeopardy during these proceedings; both had been established during trial at considerable expense to the plaintiffs—expenses for which they do not seek reimbursement. This portion of the case could not gain for them any additional benefit; it was not a hearing to determine the *amount* of damages, but only to determine the *form* which the damages might take. If any side stood to gain from these proceedings, it was not the plaintiffs, but the defendants, whose damages might be remitted in part due to their remedial efforts if equity justified it.

Moreover, the Court cannot ignore the economic disparity between the parties. Defendants are divisions of a large, multi-corporate entity; plaintiffs are merely local landowners/farmers. This disparity may have been irrelevant during the trial of the action plaintiffs themselves brought, but it is a valid consideration in a phase where plaintiffs have won the trial and the form of damages itself is the only consideration. The Court recognizes that defendants' expenses during this phase of the proceedings have been substantial and have far exceeded the plaintiffs' costs; but the Court also recognizes that defendants are more able to afford the expense than plaintiffs are, and that these proceedings are only for the benefit of the defendants. With these considerations in mind, the Court will now make the following determinations.

## B. *Statutory Authority to Tax Costs*

The Court is authorized in its discretion to tax certain costs against the defendants pursuant to 28 U.S.C. § 1920. Among these are fees of the court reporter for transcripts and witness fees for non-party witnesses. These fees the Court taxes against defendants.

The remaining categories of expenses the Court characterizes into the following groups: Attorneys' fees (including both fees and attorney travel expenses); discovery costs (including telephone expense, copying and postage); and expert fees (including laboratory expenses and expert fees). The Court will discuss them seriatim.

## C. *Discovery Costs*

The discovery costs sought by plaintiffs are not specifically authorized by any statute as costs which may be awarded. Discovery costs normally are not recoverable,

as defendants point out, citing a previous opinion of this Court. *Miller v. City of Mission*, 516 F.Supp. 1333, 1339 (D.Kan. 1981) (quoting *Quandt v. Beech Aircraft Corp.*, No. W–4464 (D.Kan., *unpublished*, Apr. 24, 1981)). Like other such costs, though, discovery costs may be taxed in certain circumstances. *Worley v. Massey-Ferguson, Inc.*, 79 F.R.D. 534 (N.D.Miss. 1978). The Court is granted a certain amount of discretion on such items pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, which provides: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs...." While the discretion granted the Court pursuant to this statute normally only applies to statutory items, *see* 28 U.S.C. § 1920, the Court in its discretion may also award non-statutory costs which were reasonably incurred. *Schmid v. Frosch*, 609 F.Supp. 490, 492 (D.D.C.1985).

█ It is not surprising that the taxing of items such as postage, copying and telephone calls have not been clearly settled by statute, rules or case law. The Court has found instances in which such items were all taxed, *see, e.g., Zeffiro v. First Pennsylvania Bank, N.A.*, 574 F.Supp. 443, 449 (E.D.Pa.1983), *on reconsideration*, 581 F.Supp. 811 (E.D.Pa.1983), *aff'd* 746 F.2d 1465 (3rd Cir.1984); and instances in which all items were all not, *see, e.g., Keith v. Volpe*, 501 F.Supp. 403, 415 (C.D.Cal.1980). Other examples abound of either allowing these types of expenses, *see, e.g., Lenard v. Argento*, 699 F.2d 874, 900 (7th Cir. 1983), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *Clark v. Marsh*, 609 F.Supp. 1028, 1035–36 (D.D.C.1985); *Davis v. Reed*, 72 F.R.D. 644 (N.D.Miss. 1976); or of not allowing these types of expenses, *see e.g., Wahl v. Carrier Manufacturing Co. Inc.*, 511 F.2d 209, 216–17 (7th Cir.1975); *Zdunek v. Washington Metropolitan Area Transit Authority*, 100 F.R.D. 689, 692 (D.D.C.1983); *Morrison v. Alleluia Cushion Co., Inc.*, 73 F.R.D. 70 (N.D.Miss.1976). Since the Court has just cited examples on both sides of the question from the same courts, it should be apparent that there is no hard and fast rule governing awards of these costs. Instead, the governing rule seems to be the discretion of the Court. *Mikel v. Kerr*, 499 F.2d 1178, 1183 (10th Cir.1974); *Welsch v. Likins*, 68 F.R.D. 589, 595 (D.Minn.1975), *aff'd* 525 F.2d 987 (8th Cir.1975). The Court's discretion is based on the ancient practice of equity. *County of Suffolk v. Secretary of Interior*, 76 F.R.D. 469, 473 (E.D.N.Y.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). In equity, the Court is empowered to do what should be done to set things aright. In consideration of the unique situation of this matter, as set out in the introduction to this section, the Court finds good cause to exercise its equitable discretion to tax these costs against the defendants.

### D. *Attorneys' Fees*

The Court next examines plaintiffs' request for attorney fees. It has been established beyond contravention that the American Rule is that a prevailing litigant is not normally entitled to collect attorney fees from the loser. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). The Supreme Court has made clear that this is not only the prevailing rule, but it is a rule to which the courts should not make exceptions without "legislative guidance." *Id.; Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 415, 98 S.Ct. 694, 697, 54 L.Ed.2d 648 (1978).

There are a few established exceptions to this rule, which are also universally recognized. The most common exception is that attorney fees are awardable when Congress has specifically authorized the award by statute, or they are otherwise awardable pursuant to contract or agreement. *Runyon v. McCrary*, 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976); *Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1091 (10th Cir.1980). They can also be awarded when the losing party brought or defended the action in bad faith or vexatiously. *Rut-*

*ledge v. Sunderland,* 671 F.2d 377, 382 (10th Cir.1982); *Kahan v. Rosenstiel,* 424 F.2d 161, 167 (3rd Cir.1970), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). None of these exceptions apply here.

There is also discussion suggesting that this rule may not apply in a diversity case. *Alyeska Pipeline,* 421 U.S. at 259, n. 31, 95 S.Ct. at 1622 n. 31. This exception is fashioned to allow enforcement of a state law which reflects a "substantial policy of the state." *Id.* Although the diversity issue was raised here, Kansas has no such state law or policy.

Plaintiffs also advance the "private attorney general" concept to support their request for fees in this instance. This theory supports awarding the prevailing parties such costs when they brought the action to benefit the public at large and without any large financial incentive of their own. *Wilderness Society v. Morton,* 495 F.2d 1026 (D.C.Cir.1974). The application of this concept is strictly limited. It should not be used merely to jettison the traditional rule against the non-statutory award of attorneys fees to prevailing parties whenever a court determines that policy considerations support the award. *Alyeska Pipeline,* 421 U.S. at 263, 95 S.Ct. at 1624. Some Circuits have expressly rejected the "private attorney general" concept supporting an award of attorney fees, finding that *Alyeska Pipeline* preempted that theory. *Huecker v. Milburn,* 538 F.2d 1241, 1246 (6th Cir.1976); *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53, 59 (3rd Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976). Construing that concept narrowly, the Court cannot find that it justifies an award of attorneys fees in this case. Plaintiffs did bring this action seeking clean water, but the water they sought to clean up was all under their own land. It cannot be said that plaintiffs brought this action without any substantial economic incentive on their own. They sought and were awarded substantial actual and punitive damages.

In its previous discussion dealing with discovery costs, the Court relied in part on the provision of Rule 54(d) of the Federal Rules of Civil Procedure to support an award of those costs to the plaintiffs. Rule 54(d) does give the Court broad discretion, but it does not encompass the award of attorney fees. The American Rule is too well established to allow the Court's discretion to be stretched that far. *Pigeaud v. McLaren,* 699 F.2d 401 (7th Cir.1983).

■ Having considered all exceptions to the American Rule which might possibly be applicable, the Court finds that none warrant awarding attorneys fees to plaintiffs. The Court further finds that equity does not demand that attorneys fees be awarded in this particular instance. Therefore, this portion of their motion must be denied.

## E. *Experts' Fees*

The last requested item for which plaintiffs seek indemnification is their expert expenses. The general rule regarding the recovery of experts' fees is somewhat analogous to the American Rule regarding attorneys' fees: they generally are not recoverable insofar as they exceed the statutory amount authorized for witnesses in general. *Miller v. City of Mission,* 516 F.Supp. 1333, 1340 (D.Kan.1981). However, this rule is not nearly as inflexible as the attorneys' fees rule; indeed, some courts have held that it was an abuse of discretion for the trial court *not* to award expert fees in full. *Coleman v. City of Omaha,* 714 F.2d 804, 809 (8th Cir.1983); *Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201 (3rd Cir.1981). Obviously, then, the award of experts' fees cannot be completely analogized to the American Rule, but requires more of a factual analysis by the Court.

The Court notes initially that case language exists which would suggest that experts' fees are never taxable. *Ramos v. Lamm,* 713 F.2d 546, 559 (10th Cir.1983). *See also Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 865 (7th Cir.1981); *Bosse v. Litton Unit Handling Systems,* 646 F.2d 689, 695 (1st Cir.1981); *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir. 1981), *overruled by International Woodworkers of America, AFL–CIO v. Champi-*

*on International Corp.*, 790 F.2d 1174 (5th Cir.1986) (recognizing three narrow exceptions to the general rule); *Ott v. Speedwriting Publishing Co.*, 518 F.2d 1143, 1149 (6th Cir.1975).

A review of caselaw in full has persuaded the Court that the law is actually broader than such language may suggest. While the general rule is that such fees are not taxable, exceptions to that rule abound. Courts are allowed to award expert fees in their equitable discretion when the expert is court appointed, or when the Court finds that the experts' testimony was crucial and indispensable to the resolution of the case. *Nebraska Public Power District v. Austin Power, Inc.*, 773 F.2d 960 (8th Cir.1985) (awarding expert fees pursuant to Federal Rule of Civil Procedure 54(d)); *Cagle v. Cox*, 87 F.R.D. 467, 471–72 (E.D.Va.1980); *Worley v. Massey-Ferguson, Inc.*, 79 F.R.D. 534, 540–41 (N.D.Miss.1978); *Welsch v. Likins*, 68 F.R.D. 589, 596–97 (D.Minn.1975), *aff'd*, 525 F.2d 987 (8th Cir. 1975). *See also* 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2668. This doctrine has also been recognized in this circuit. *Bruno v. Western Electric Co.*, 618 F.Supp. 398 (D.Colo.1985); *Keyes v. School District No. 1*, 439 F.Supp. 393 (D.Colo.1977). The Court finds the *Keyes* case especially apposite to this case. There the Court found an award of expert witness fees justified despite the usual rule because the expert's testimony was indispensable to establishing the claim and *determining the plan.*

Defendants argue to the Court that plaintiffs cannot rely on the "court-appointed expert" doctrine to justify an award of expert fees in this case because the Court expressly denied a motion by plaintiffs for a court appointed expert on February 25, 1986. Dk. no. 624. That order needs to be viewed in context. Plaintiffs' motion (Dk. no. 560) specifically sought the appointment of "independent experts" or "special consultants." The Court denied that motion upon a finding that "[a]t this time, ... plaintiffs' and defendants' experts are adequately developing the issues." The Court also reserved the right to reconsider this matter later, if necessary. The Court never found it necessary to reconsider that decision, remaining convinced that the experts active in the case were doing an adequate and sufficient job. One of those experts was Dr. Dan Raviv, "plaintiffs' expert." The Court has previously indicated, both in its written opinions (*Miller*, 592 F.Supp. at 999) and in its courtroom comments, that it found Dr. Raviv to be highly credible.

When the Court initially ordered the defendants to investigate potential cleanup alternatives, it ordered them to do so "in consultation with an expert to be designated by the plaintiffs, and possibly an additional independent expert to be selected by the Court...." *Id.* at 1009. The later order of this Court denying plaintiffs' motion for a court appointed expert must be understood in that light; what the Court declined to do was to select the additional independent expert. The expert designated by the plaintiffs, Dr. Raviv, was involved in the remedial action phase by specific order of this Court, and his involvement was not affected by the Court's later order. In this context, it is apparent that Dr. Raviv was not only a court appointed expert, but he was no longer "plaintiffs' expert." Defendants were required by this Court to work with him in developing their plan. Defendants admit, albeit rather grudgingly, that Dr. Raviv did work with them in the development of the plan. Dk. no. 634, p. 5. This Court's own observation of the development of defendants' plans (see discussion on Remedial Action Plans *infra*,) convinces it that Dr. Raviv was involved throughout. In fact, the final plan presented to the Court by defendants was largely the result of Dr. Raviv's suggestions. Defendants suggest that Raviv's involvement was insignificant in comparison to that of "their" experts, Paul Roux and Leonard Eder. That assertion is doubtless correct, but it is immaterial to the disposition of this issue.

█ Therefore, as Dr. Raviv was in reality "defendants' expert" for the purpose of the remedial action phase of this case— that is, he was an expert defendants were required to and did consult in their plan

development—it is not only equitable to require them to pay his fees, but it is to be expected. The Court is convinced that this case, with its unusual post-trial phase which could only benefit the defendants, is one of those unusual circumstances which case law indicates would justify the award of expert fees. The facts of the post-trial activity of this case which the Court has previously detailed clearly suggest that equity would require defendants to pay for plaintiffs' expert fees for the development and review of defendants' proposed remedial action plans. But the Court finds that it is not necessary to reach the analysis of whether this case is such a case justifying the unusual award of expert fees against the losing party. Its initial opinion *required* defendants to consult an expert designated by plaintiffs during this phase. It should come as no surprise now that defendants are responsible to pay for the expert consultations which they received. The Court finds that all of Dr. Raviv's fees and expenses incurred in connection with the post-trial remedial action phase of this suit are properly taxable to the defendants.

The Court notes that plaintiffs' request for expert fees encompasses more than fees paid to Dr. Raviv. They also seek reimbursement for expenses incurred with the following "experts": Clarke Well and Equipment, Charles Wilson, Curtis Miller, and John Peck. These appear to make up less than one-fourth of their total requested expert fees, the balance all being fees billed by Dr. Raviv. The Court is not clear what role these other "experts" are alleged to have played in the development of the remedial action phase of this case. Two things are clear to the Court: their use was not initially authorized by the Court (only one expert was, and that clearly has been Dr. Raviv), and since the Court is unaware of what these "experts" even did, it cannot be said that their testimony or activity was indispensable to the resolution of this case. Therefore, the Court finds that none of their fees are properly taxable to the defendants.

Plaintiffs also have requested reimbursement for certain "lab fees" which the Court has characterized as part of their request for expert fees. Their motion does not make clear for what purpose these lab fees were incurred. If they were incurred pursuant to Dr. Raviv's work with defendants' experts in developing the plans, then they are properly taxable to the defendants. If they were not so incurred, then they are not taxable to the defendants. Having said that, the Court is constrained to add the qualification that, if any of Dr. Raviv's fees were incurred for any reason not directly related to the development of the plan, such as testimony in support of one or more of plaintiffs collateral motions, then such fees may not be taxed to the defendants.

In summary, the Court finds that the following costs are properly taxable to the defendants: transcripts, witness fees, copying expenses, postage, long distance telephone expenses, and all fees billed by Dr. Raviv in connection with his work on defendants' development of a remedial action cleanup plan, including any lab fees related to that work. The following requested costs are not taxable to the defendants: attorneys' fees, attorneys' travel expenses, and all expert fees and lab fees not incurred pursuant to Dr. Raviv's work on defendants' development of their remedial plans. Because the Court has divided up the allowable and nonallowable expenses in a different fashion than plaintiffs did in their requests, the Court orders that plaintiffs submit within twenty days from the date of this order a revised statement of costs, itemizing all post-trial costs for which the Court has authorized recovery. This statement should include explanation or justification of the purpose for which the fees were incurred, when necessary. Should defendants have any reason within the scope of this order to object to this statement of costs, they may file their objections within ten days of the date of plaintiffs' filing.

## V. REMEDIAL ACTION PLANS

Despite what the lengthy preceding portions of this ruling might suggest, the Court only now comes to the issue for which it retained jurisdiction over this mat-

ter: consideration of remedial cleanup alternatives. Because so much time has elapsed since the Court initially ordered the remedial cleanup investigation, and since so many (mostly erroneous) assertions have been made during that time about why the Court made this order, what its intents and purposes were in doing so, and what type of cleanup was envisioned by the Court and the parties *at that time*, the Court will review the context in which this order was made before discussing the development of the case during the remedial phase.

## A. *Preliminary Motions*

Before the Court can address the question of the remedial action plan, it finds once again that it must first dispose of some procedural motions. This it will do in short order.

### 1. *Motion to Strike the Affidavit of Elly Triegel*

As the Court has mentioned before, the "motion to strike" is a favorite in this case. The Court has typically denied such motions, assuring the parties that because this matter is being tried to the Court, it will be able to dismiss from consideration any impermissible assertions.

This motion is slightly different, though. Plaintiffs move to strike the affidavit submitted by defendants because it deals only with the cleanup, and was filed well beyond the deadline imposed by the Court for filing anything regarding the plans. *See* Dk. no. 655 (Order of the Court dated April 23, 1986 imposing a deadline of May 23, 1986, for filings from either side concerning the remedial cleanup plan, and stressing that no later filings would be considered by the Court). The Court has already held plaintiffs to this order. *See* Dk. no. 668. Defendants do not deny that the affidavit was late (it was filed on July 28, 1986), nor that it deals only with the cleanup. Instead, they rather cavalierly suggest that it is clear that the deadline was not an absolute deadline, and that the Court itself did not even adhere to it (citing an irrelevant example).

The Court's order meant what it said. The affidavit was filed untimely. In the interests of fairness and impartiality it must be struck. Plaintiffs' motion is granted.

### 2. *Motion to Strike Status Report*

Another motion to strike. This time plaintiffs seek to strike a status report filed by defendants regarding various projects at the salt plant, on the ground that it includes information plaintiffs should have been given earlier, but were not. If plaintiffs' assertion is true, the appropriate remedy is not to strike the report. The Court need not discuss this matter further, except to cite it as yet another example indicative of the ongoing disputes between the plaintiffs and the defendants. The motion is denied.

### 3. *Motion to Preclude Consideration of Non-evidentiary Matters*

Defendants move for an order "precluding from consideration as evidence ... the unsworn communication of non-parties, including letters and statements, where the non-parties have not been subject to cross examination ..., to the extent these statements make representations of fact." Dk. no. 698, p. 1. Defendants' concern here is with the communications from state agencies which were solicited by the Court. In particular, they seem concerned with an "absurd representation" made in a June 20, 1986 letter from Big Bend. Defendants were especially concerned with their inability to cross examine the Agencies at the June 2, 1986 hearing, to which they objected at the time. Plaintiffs suggest that the defendants are being a bit schizophrenic; on the same day in which defendants filed this motion they filed another motion in which they relied in part upon the testimony of one of the agencies representatives at one of the hearings.

■ The Court does not find the defendants' actions as inconsistent as plaintiffs suggest. Defendants are only asking that the communications not be considered *to the extent that they make representations of fact.* The Court certainly did not

solicit the agencies comments so that it could ignore them. But the Court will not consider as evidence any representations by the agencies which goes to the disputed facts of the suit. The Court will consider their submissions solely for the reasons they were solicited: as they relate to the agencies involvement in any proposal before the Court, the agencies' administration of their own duties and responsibilities imposed by state law, and their technical review of the proposed plans from their standpoint of involvement. The Court does not see the defendants as objecting to consideration of these types of factors, and since the Court is not considering or relying on the Agencies' representations as to any disputed facts or other than as stated above, the Court concludes that it must be granting defendants motion. Therefore, upon this understanding, defendants' motion is granted.

### B. *Reasons for the Remedial Cleanup Investigation Order*

On August 13, 1984, this Court issued its "final ruling" in *Miller v. Cudahy Co.*, 592 F.Supp. 976 (D.Kan.1984). The Court found for the plaintiffs, awarded them $3,060,000.00 in actual damages, and $10,-000,000.00 in punitive damages. Evidence had been received at trial in response to a Court inquiry which suggested that a cleanup of the aquifer might be technologically and scientifically feasible. The Court considered that possibility to be the preferable remedy for this matter, and therefore desired to pursue that option.

The Court finds that it would be beneficial to refer to its original Conclusions of Law, from the August 13, 1984 Opinion and Order, regarding the Court's purpose in ordering the defendants to pursue this option.

35. In the further exercise of its equitable jurisdiction, this Court concludes that substantial justice would best be worked between these parties if the defendants could accomplish, at their own expense, the removal of a substantial majority of the salt from the aquifer. The removal of salt from the aquifer would settle the most significant matter in controversy between these parties, restore them to their respective positions before the nuisance was created, and prevent further biannual litigation of the matters of concern in this lawsuit. This Court has the equitable power to order the defendants to undertake such a clean-up.

36. At the present time, the Court is without sufficient knowledge or information to order the defendants to undertake any particular remedial program. Additional work by competent experts is needed to determine the existence, cost, efficacy, and feasibility of the various clean-up strategies that are or may be available to the defendants....

37. Were defendants to make a conscientious, good-faith, and realistic effort to address and remedy, within a reasonable time, the pollution presently existing in the aquifer, such an effort would be extremely relevant to this Court's assessment of the defendants' state of mind and to the appropriateness of the award of punitive damages that this Court has found to be fully justified in this case. In the exercise of its broad equitable powers, this Court concludes that the ends of substantial justice would best be served by holding the final judgment as to the punitive damage award temporarily in abeyance, pending the defendants' good-faith efforts to define and remedy the pollution they have caused. The Court will retain jurisdiction over this case and the punitive damage award to the fullest extent permitted by law while the clean-up alternatives are investigated and implemented, and may activate by a final judgment the punitive damage award, in whole or in part, at any time that it becomes apparent that the defendants are not pursuing the clean-up effort in good faith, or at any time that it becomes apparent that any clean-up effort is impossible for either scientific or financial reasons.

*Id.* at 1007–1008.

Several things are worth noting regarding the Court's retention of jurisdiction during this remedial action phase. First,

as paragraph 37 makes clear, the Court only retained jurisdiction over the punitive damage award. The fact that the Circuit Court has declined to review the matter until all parts of the case are final does not change the finality, in this Court, of its findings of liability and actual damages. The Court has been frustrated throughout the last half of the this remedial action phase by the defendants' constant efforts to retry these issues. This Opinion has dealt with this problem previously and will not rehash it here.

Second, the Court retained jurisdiction to allow the development of a remedial action plan for equitable reasons only. The defendants have insinuated that the Court is *obligated* to remit the punitive damages *in whole* if defendants develop and implement *any* cleanup plan. This is a gross mischaracterization of the Court's order. The Order is clear (paragraph 37) that only a "conscientious, good-faith, and realistic effort" to address the problem would be considered, and that it would only be considered as "relevant to this Court's assessment of the defendants' state of mind and to the appropriateness of the award of punitive damages" that the Court had imposed. In short, an appropriate amount of punitives would be remitted only if the Court was convinced, through the development and implementation of a plan, that the defendants' goodfaith effort to clean up the aquifer which they had polluted demonstrated that the $10,000,000.00 punitive damage award was not justified. Further, the Order is also clear that the Court retained the fullest power over the punitive damage award possible, including the power to activate the punitive damage award *in whole or in part* if it became apparent that the remedial effort was not being pursued in good faith or was not feasible. The Court most definitely did not give the defendants the option of choosing between paying the punitive damage award or implementing a cleanup plan of their choosing.

Third, the concept of a cleanup plan should be viewed in the context of what was envisioned at the time of trial. Brief testimony near the end of the trial was received in response to Court inquiry that cleaning up the aquifer might feasible. Although this possibility was not developed in depth during the trial, it was the understanding of all sides then that such a cleanup could be accomplished in a relatively short period of time. The Court recalls a time span of five to fifteen years. Defendants suggest that the time span then considered was six to twenty years. Dk. no. 577, Vol. 1, p. 3. The difference is not important; all sides agree that the time frame contemplated then was considerably shorter than the ones considered now. In part, the much abbreviated time frame was based on a faulty belief by all sides that, if all pollution ceased, the aquifer would naturally cleanse itself in thirty years. These original time frames have proved to be off by as much as a factor of ten to twenty, as will be discussed below. When interpreting the Court's initial order, discussions of feasibility must be viewed in the light of what was understood at that time. The Court's order that the defendants make an effort to remedy the pollution "within a reasonable time," paragraph 37, must also be understood within this context.

Finally, defendants were required to proceed in good faith. Plaintiffs have suggested to this Court that almost every action which defendants have taken was not in good faith. Although the August 13, 1984 Opinion makes clear that this Court had serious concerns about defendants' motivations and attitudes, the Court is not prepared to adopt plaintiffs' sweeping accusations. This does not mean, however, that the Court has been pleased with defendants' conduct throughout the course of this remedial action phase. The highly contentious spirit between the parties, which at times almost precluded the conduct of orderly and productive hearings, has continued unabated. Fault for this lies on both sides. But as the Court will demonstrate, the defendants' conduct in the development of the plans proposed and their aggressive use of remedial action investigation to make collateral attacks on the final judgment of this Court are all relevant to good faith, and will be so considered. The Court

will now review the development of the remedial action plans which were presented to this Court in light of the reasons for which the remedial action stage of this case was originally ordered.

### C. *Development of the Remedial Action Plans*

#### 1. *200 Year Plan*

The Court's August 13, 1984 Order required the defendants to begin investigation of cleanup alternatives and to present their final report on the available cleanup alternatives within eight months. *Miller*, 592 F.Supp. at 1009. A status conference was held the following month to determine some parameters and guidelines for the conduct of the investigation, but thereafter the Court's involvement inthe ongoing investigation was basically limited to granting the defendants additional time in which to present their final report. Because of this limited involvement, the Court was unprepared for the proposal which defendants filed on November 20, 1985. This "Proposed Remedial Action Plan for the Cow Creek Aquifer" was a four volume report consisting of a proposed remedial action plan and seven appendices. Dk. no. 577. For obvious reasons, the Court is forced to summarize the report, and for purposes of the developing history of the series of plans which were to be filed, the Court can summarize this report by extracting one sentence from it: "We now know that the length of time and the costs required to remediate the Cow Creek Aquifer are much greater than previously thought." Dk. no. 577, Vol. 1, p. 2. "Much greater" indeed, for as the Court was shocked to learn, the defendants were proposing a plan whose duration was two hundred years! For the Court, which was still thinking in terms of the five to fifteen years envisioned at trial, this proposal of a plan entirely as long as the history of this nation's constitution was stunning.

In fairness to the defendants, the reason for the multiplication of plan length should be explained. The investigation revealed two aspects of the aquifer which were significantly different than originally thought.

First, because the recharge rate of the aquifer was less than originally thought, *see supra* discussion on New Trial, the rate at which water may be safely withdrawn from the aquifer, as established by the Big Bend Groundwater Management District, was relatively small. Being able to withdraw less water from the aquifer increased the time it would take to clean the aquifer. Big Bend later informed the Court that it would permit the maximum rate to be exceeded for purposes of a cleanup. As it explained, damage to the aquifer by "drawdown" (excessive lowering of the water table in the aquifer due to withdrawing too much water) was significant only as it related to the inability of the aquifer water to be put to beneficial use; but in its polluted state, the water had no beneficial use.

The second way in which the aquifer differed from what was originally believed is much more significant. The defendants' investigation discovered that removal plans and indicators must be built around sodium rather than chloride. The determinative factor was the sodium adsorption ratio [SAR], which the Court has discussed briefly earlier. *See supra* III. New Trial. An SAR reading of seven is the maximum level at which irrigation can safely proceed. The aquifer had incredibly high SAR readings, particularly in the center of the plume. The SAR levels revealed by testing were so inconsistent, both between wells and at individual wells at varying times, as to preclude giving any meaningful average or norm of SAR levels in the aquifer. Defendants' report lists the various readings at the various test wells. Dk. no. 577, Vol. 1, Part C, Attachment C–1.

What makes the SAR such a problem is that absorption of sodium onto the clay particles in the soil causes the rate of sodium removal to lag behind the rate of chloride removal. Put simply, the chlorides in the water can be removed by withdrawing the chloride-contaminated water from the aquifer and either purifying it for reinjection into the aquifer, or disposing of it to allow pure water to naturally recharge the aquifer. But once the chloride-contaminated water is removed, the chlorides are

also removed. Sodium, on the other hand, attaches itself to the clay particles in the soil surrounding the aquifer. Therefore, if all of the sodium-contaminated water is theoretically removed from the aquifer, sodium will still remain in the clay. Then, when pure water recharges the aquifer, this sodium will repollute the water. One witness compared it to rinsing out a soapy sponge in a clean bucket of water: one can fully saturate the sponge and then squeeze it dry, but soap still remains. It takes two or three "squeezes" to rinse the soap out. Sodium works in a similar fashion. Defendants' experts predicted it would take two or three "rinses" to remove sufficient sodium from the aquifer to lower the SAR of the water to seven.

Because of the combination of these factors, defendants estimated that the time necessary for the aquifer to naturally clear itself was 190 to 240 years, rather than the 20 to 30 estimated at trial. Defendants also estimated that, as a result of these factors, the costs of remedial measures to accelerate the remediation process to within less than 30 years would be between $11,000,000.00 and $34,000,000.00 in capital costs, with annual operating costs of $2,300,000.00 to $9,700,000.00. Even then, defendants ominously intoned, there was "no technical assurance or previous experience to indicate that, in practice, these systems would meet their design targets or that the theoretical acceleration in remediation time could be achieved." Dk. no. 577, Vol 1, p. 4.

In light of these dire warnings, defendants then unveiled their plan. Briefly put, the plan involved five steps: 1) eliminate potential sources of contamination; 2) control the further spread of contamination; 3) establish an ongoing monitoring program; 4) provide fresh drinking water supplies to the affected homeowner population; and 5) compensate landowners who cannot obtain irrigation water from their land because of the salt pollution. The upshot of the proposed plan was that it only intercepted polluted water to prevent it from moving downstream. Defendants described it as being "designed to establish barrier interceptor systems across the entire plume at four locations." Dk. no. 644, p. A–1. The plan disposed of this water rather than purifying it and returning it to the aquifer. It did nothing to clean up the existing polluted areas. It was more of a "containment" plan than a cleanup plan. Defendants calculated the present value cost of this plan to be $3,456,000.00. The plan would take 200 years to implement. Because of that, this plan came to be known as the "200 year plan," or, as other plans were later designed from it, the "Base plan." Testimony was also offered that it would take the aquifer 300 years to naturally clean itself.

Defendants did present various "Acceleration Alternatives" to the proposed 200 year plan. These ranged from accelerating the cleanup to 67 years, at an *added* present value cost of $1,686,000.00, to accelerating the cleanup to 5 years, at an *added* present value cost of $71,030,000.00. Defendants compared these costs to the differential market value of the land in its non-irrigable state and, not surprisingly, recommended that none of the accelerated alternatives be imposed. Instead, they recommended a one-time compensation to the landowners for their inability to irrigate.

It would be an understatement to say that defendants' proposed 200 year plan did not receive a warm reception. Plaintiffs filed a lengthy "Observations and Objections to the Cleanup Plan," Dk. no. 590. Therein they objected that this plan did not address the issue of providing fresh water to the plaintiffs, protesting that they needed salt removed from the water, not water removed because it was salty. They objected because this plan would significantly reduce the water flowing towards them, thereby providing even less water to flush out the pollution below plaintiffs' lands. They characterized the plan as not a cleanup, but merely a proposal to change an underground polluted stream into an underground polluted, stagnant lake. Finally, plaintiffs objected, as did the Court, to defendants' presuming to substitute their own standards of damages for the Court's, via their proposal to pay plaintiffs the differential of the value of non-irrigable land

to irrigable land. Presumably, this was tied with defendants' suggestion that the ten million punitive damages award be replaced by the three million dollar plan, plus this differential; a proposition which the defendants would no doubt prefer.

The hearing held on this proposal on January 16 and 17, 1986, further underscored the hostile reaction to this 200 year plan. Plaintiffs may be forgiven for their bitter sarcasm at that hearing. The Court itself questioned whether anything which would take 200 years could realistically be called a "plan." Plaintiffs' expert, Dr. Dan Raviv, suggested the the cleanup be approached solely from the view of cleaning up chlorides to an acceptable 250 ppm level, and suggested the placement of additional wells. Defendants' experts, Mr. Leonard Eder and Mr. Paul Roux, informed the Court that the Base plan, if operated solely to clean up chlorides rather than being concerned with sodium, could reduce the chloride level in the aquifer to 250 ppm within 100 years. This became known as the "100 year plan." Roux and Eder further agreed to work with Raviv on his additional wells proposal, and requested thirty days to do so. Another hearing was set for February.

## 2. *February Modifications to the Plan*

Another hearing was held February 18 through 21, 1986. Defendants presented their modifications to the Base plan to incorporate the chlorides-only approach. They first informed the Court that their data suggested it would take the aquifer 180 years to naturally clear itself to the maximum acceptable chloride concentration of 250 ppm.

Defendants presented two modifications to the plans. The first modification reduced the total remediation time by fifty percent at an additional cost of only ten percent above the Base plan (here, the Base plan refers to the 100 year plan, not the 200 year plan, since sodium was not being considered). This first modification will be referred to as the "50 year plan." The reduction in remediation time was accomplished by "moving wells" as certain areas cleared; that is, reducing the pumping volume of wells in certain areas and drilling new wells in other areas to increase the rapidity of their cleanup, all the while staying within the maximum pumping rate from the aquifer that the drawdown and recharge rate would allow. The plan estimated that the first phase of cleanup would last 15 years, and thereafter wells could be "moved" or newly drilled to the other areas for a second phase, estimated to take 35 years. During this phase, pumping would continue in the original areas, but at a reduced rate. This plan was now the "recommended plan" by American Salt; and although there were more plans to come, it would remain their recommended plan throughout the duration of the remedial action hearings.

The second modification provided further acceleration of the remedial plan by adding an additional well immediately into the area where the new wells would be drilled in the second phase of the 50 year plan. The plan would then proceed largely as the 50 year plan would, but because of the additional well, the cleanup time for the second phase would be reduced from 35 to 17 years, creating a total estimated cleanup time of 32 years. Defendants and their experts did not recommend the "32 year plan" because of their concern that its accelerated pumping "would probably stress the aquifer and cause significant drawdowns in some areas and may change Cow Creek from a gaining to a losing stream." Dk. no. 644, p. C–1. It was also not recommended because the cost/benefit ratio was considered unacceptable. They characterized this plan as an aggressive, risky plan. Defendants did find the 32 year plan acceptable from an environmental and technical standpoint.

Defendants also presented to the Court their calculations of the various plans' costs, in present value. The 100 year plan was estimated to cost $3.455 million, the 50 year plan to cost $3.717 million, and the 32 year plan $4.489 million. Costs were represented to be accurate only within ten percent. The lengths of the plans were also represented to be only estimates, which could vary considerably once actually put into effect.

Defendants apparently developed these two modifications on the very eve of the hearing. Plaintiffs complained that they were unprepared to adequately address these plans because defendants had told them as recently as the Friday before the Tuesday hearing that they were still recommending the Base plan. Defendants' experts admitted that the two modifications were pulled together over the weekend, portions of them as late as Monday evening. They testified that this was done because defendants' attorneys were reluctant to stick with the Base plan, due to their feeling that the Court had been "disappointed" with the time span. The Court was concerned about the potential last minute sandbagging of the plaintiffs by this surprise move, but over the course of the highly contentious four day hearing grew less concerned that plaintiffs were actually harmed by defendants' midnight hour strategy. However, the timing of this did raise some concerns in the Court's mind regarding defendants' "good faith."

In the course of the hearing Ron Nugent, President of American Salt, testified that the company was committed to a cleanup regardless of the outcome of the suit. In response to the Court's question, he assured the Court that he spoke not only for American Salt, but was authorized to speak for the parent company as well.

Plaintiffs' expert, Dr. Dan Raviv, presented his evaluation of the plans to the Court. Raviv expressed some concerns with defendants' plans, and detailed a few shortcomings he saw. He testified that he was surprised to show up in court and see the 32 year plan presented, but he found that plan very positive. Raviv sketched out a few modifications he would suggest to the 32 year plan. Roux and Eder requested an additional thirty-five to forty days to review these with him, and then present the modification to the Court. Another hearing was set for April.

### 3. *The Ten Interceptor Well Plan*

On April 14, 1986, one week before the next scheduled status conference, defendants filled a detailed description of the "Ten Interceptor Well Plan." Dk. no. 644. This plan was presented in written form with detailed descriptions and supporting data (similar to the defendants' original Base plan and unlike the 50 year plan and the 32 year plan, which were prepared overnight). This plan is in essence a modified 32 year plan. Although defendants' experts prepared and presented this plan, it was the product of Raviv's suggestions made at the February hearing. Defendants represented this plan to be environmentally sound and technically feasible, but not cost effective. Therefore, they did not and do not recommend this plan; their recommendation continued to be the 50 year plan.

This plan still addressed only the necessary remedial action to reduce chlorides to 250 ppm, and did not address the sodium problem. The major change in this plan was that a larger number of lower volume wells is used. Separate provisions for potable water were still included, since this plan, like all of the plans, is most accurately characterized as a modification of the Base plan. Defendants estimated that the cost of this plan would be $4.8 million. Costs for the 100 year, 50 year, and 32 year plans were revised.

Throughout the course of the hearings, state agencies who had oversight responsibility for the water in the aquifer and/or the pollution there had attended and closely monitored the progress of the plans. These agencies were the Kansas Department of Health and Environment [KDHE], the Big Bend Groundwater Management District [Big Bend] and the Kansas State Board of Agriculture's Division of Water Resources [DWR] [hereinafter collectively referred to as the Agencies]. The Court was aware and appreciative of the Agencies attentiveness, and had invited them to inform the Court in writing of their reactions to the proposal that defendants would file. On the day of the status conference, both KDHE and Big Bend, as well as the plaintiffs and their expert Raviv, presented the Court with written reactions to the Ten Interceptor Well Plan.

The status conference was held on April 21, 1986. Defendants' experts, Roux and Eder, presented the Ten Interceptor Well Plan and the 50 year plan in detail, explaining how they would work. Roux represented that there were only three areas of major disagreement remaining between the experts: the question of whether the 50 year plan or the Ten Interceptor Well Plan was better, disagreements over who should monitor and administer the remedial cleanup, and a technical dispute over a disposal well. Defendants estimated that the Ten Interceptor Well Plan would take 35 to 50 years to complete.

In his written comments and in his testimony, Raviv expressed various technical concerns and administrative, reporting recommendations. Defendants had recommended that KDHE administer the plan. Raviv objected to the term "administer" and requested guidelines from the Court as to who would oversee and control the operation of the remedial action. He also objected to the defendants' calculation of the cost of the Ten Interceptor Well Plan. Defendants represented that, of the $4.8 million figure they projected, $1.713 million had already been spent. Raviv protested that the figure of monies already spent included costs for site investigation and some plant modification; expenses which were not relevant to the remedial action.

In its review of the Ten Interceptor Well Plan, KDHE initially presented to the Court the state's interest in the cleanup of the polluted aquifer, noting that "[g]roundwater in Kansas represents a limited and highly valuable resource to the State." Dk. no. 648, p. 1. It voiced an initial concern that, while the 250 ppm chloride standard adopted by the parties was satisfactory, attention should also be given to the sodium content. KDHE suggested that sodium should be monitored, and desired to see the sodium content lowered to a maximum of 100 ppm. It further provided a valuable technical critique of plan particulars. Concern was also expressed about sources of continuing pollution, especially from the settling pond in the brine fields. The Court had found the brine fields to be a source of pollution in its August 13, 1984

opinion, but the defendants had stoutly contested that finding throughout the course of the remedial hearings. While KDHE was the state agency with primary responsibility for a pollution problem such as this one, it made clear its desire to cooperate with the Court as fully as possible: "KDHE does not want, in the interest of environmental protection, to initiate any unilateral actions which could conflict with the Court's orders. To achieve this objective, KDHE is willing to supervise the cleanup plan, to require modifications as warranted, and to institute such enforcement actions as necessary." Dk. no. 648, p. 6.

Big Bend's comments to the Court were more in the nature of expressions of concern by local people involved with water management than a technical review. Big Bend was concerned with who would evaluate the results of monitoring to determine if the plan was working, or if it needed modifications. It asked the Court to retain jurisdiction over any cleanup, something the Court was unwilling to do due to the length of any proposed plan. Big Bend also was concerned that American Salt understand that its interceptor well at the edge of its property, which was designed to intercept any brine in the aquifer before it went onto private property, was not "a license to continue to pollute the aquifer beneath their property." Dk. no. 649, p. 1.

While Dr. Raviv, plaintiffs' expert, was increasingly concurring in the direction defendants' plans were taking, the plaintiffs were not so content. In their written comments to the Court, they expressed their frustration with defendants' ever changing representations of what they were willing to do, while nothing productive was happening. They did have concerns with the Ten Interceptor Well Plan, mostly related to monitoring and administration. They were understandably concerned about defendants being solely in charge of the administration of any plan, and asked that an independent body be appointed. In the final analysis, though, plaintiffs were frustrated with the continual delays and the increasing complexity of any remedial ac-

tion. They were beginning to favor asking the Court to abandon any attempt at a Court-ordered cleanup and to just enter final judgment, a change from their original position.

### 4. *Finalization of the Proposed Remedial Action Plan*

At this point, the Court finally had before it a detailed plan which seemed feasible and which had a chance of being acceptable to all sides. The Court had several remaining concerns with the proposed Ten Interceptor Well Plan, though. Like KDHE, the Court was concerned about ignoring the sodium factor. This was being done at plaintiffs' suggestion, but the Court had not expressed its approval of that development; a cleanup that leaves considerable sodium pollution is not a cleanup. But the Court did not view this as a major impediment to plan development; earlier testimony had indicated that the remedial action to clean up the chlorides could also clean up sodium, although it might take longer.

This raised a second concern to the Court. When this remedial phase of the case was initially embarked upon, all sides envisioned that a cleanup could occur within approximately five to fifteen years. Had the Court known then that any cleanup would take decades (if not centuries), it is highly unlikely that this phase would have been embarked upon. Since the Court now found itself in the midst of plan development, it was willing to proceed to the finish in the hopes of arriving at a practical solution. But it was becoming increasingly apparent to the Court that *any* remedial cleanup could not occur under the jurisdiction of the Court. Courts are not functionally capable of overseeing something of such duration. Therefore, the Court was increasingly devoting its attention to the question of what or who would administer and oversee any remedial action. In comments received on the Ten Interceptor Well Plan, plaintiffs, Big Bend, Dr. Raviv and KDHE had all addressed this issue.

Before the Court addressed this issue, though, it decided to determine if the proposed Ten Interceptor Well Plan was in fact technically feasible. If not, the other questions evaporated; if so, they could then be addressed. The Agencies had submitted written comments to the Court on the proposed plan, but had all indicated that the brevity of time had precluded a full technical review. The Court therefore requested that the Agencies compare and fully review the Ten Interceptor Well Plan and the 50 year plan for practicality and feasibility. The Court did not presume to exercise any jurisdiction over these Agencies, and therefore did not order them to do so, but only requested them to conduct such a review if they were willing. The Court did order defendants to provide the Agencies with all necessary data to make such a review. A hearing was scheduled for June, at which time the Court instructed the parties that it and not the attorneys would ask the questions. The Court brushed aside "due process" protests to this by informing the parties that, in its opinion, this ten year old case had been "due processed to death." Although the Court had originally indicated that it would allow the attorneys to cross examine the representatives of the Agencies as they presented their reviews at that hearing, the Court later changed its mind and instructed all sides that since the Agencies were merely following their state regulatory responsibilities, and were presenting their reviews at the bequest of the Court, inquiry would be made only by the Court.

The Court received the Agencies' written reviews the last week of May, and the hearing was held on June 2, 1986. The Agencies found both plans to be feasible, but because the Ten Interceptor Well Plan allowed for accelerated cleanup without significant drawdown to the aquifer, and because it gave immediate attention to all areas of the plume, they recommended the Ten Interceptor Well Plan over the 50 year plan. Other technical suggestions were made, but as KDHE explained, there was little purpose in fine tuning the plans further due to the inherent uncertainties in any undertaking of this nature.

Two significant concerns, paralleling the Court's concerns, were also expressed. The sodium pollution in the aquifer continued to concern the Agencies, but they suggested that monitoring for both chlorides and sodium and administering the plan accordingly could resolve that problem. The administration itself was the other concern. Suggestions were made for independent monitoring. Big Bend suggested the formal creation of a decision-making task force composed of representatives from Big Bend, KDHE, DWR, the affected landowners and American Salt. This mirrored exactly the Court's thinking on this issue.

The Court conducted a hearing on June 2, 1986, at which the parties and the state agencies answered questions put to them from the bench. No formal presentation of evidence, receipt of testimony, or conduct of examinations and cross-examinations by the parties were allowed. Because the plaintiffs had expressed increasing frustration with the development of the plans, the Court first inquired of them whether they still wanted the aquifer cleanedup as a part of the judgment. Plaintiffs represented that they did, but they wanted it to happen within fifteen years as originally envisioned. They complained that within 35 to 50 years they would all be dead, and as one landowner had earlier said, "I don't consider any cleanup that doesn't happen in my lifetime to be a cleanup." The plaintiffs were also concerned because the indications were that American Salt was still polluting the environment with salt. Any cleanup effort was worthless as long as that continued, because no progress could be made. So, while they still favored a cleanup, at least in a theoretical sense, they were growing increasingly skeptical.

Their concerns about the protracted nature of these proceedings while nothing constructive was happening (concerns shared by the Court) were not helped by the defendants' opening comments that they were prepared to implement whatever plan the Court ordered "subject to its appeal rights and perhaps a stay pending it." Transcript of June 2, 1986 hearing, p. 10. This suggestion of a stay of cleanup pending appeal(s) did not assure the Court that

defendants' earlier representations of their willingness to clean up the aquifer "regardless of the outcome of the suit" were in good faith.

The plaintiffs raised the issue of being compensated for the monitor and intercept wells that would be placed on their property, much as payments are made for similar oil lease wells. They also wanted guarantees of damage payments in case these wells leaked, or if their land were otherwise damaged due to the presence and servicing of the wells.

This again raised the issue of plan administration. An entity was needed which could not only authorize modifications in the ongoing remedial action, but could also authorize payments from the funds which the Court would require defendants to post as a financial guarantee that the plan could be completed. Already, disagreements had arisen over what expenses should be considered as costs of the remediation as opposed to expenses which American Salt should have to pay as a natural part of their plant operation (see Dr. Raviv's comments on the estimated cost of the Ten Interceptor Well Plan, *supra*). Such an entity would also have to serve as a "referee" between the salt company and the landowners for disputes that would inevitably arise. KDHE represented to the Court that, while it was willing to receive input from such an entity, it was reluctant for policy reasons to sit on any board that made decisions about allocating funds. While it understood that any order the Court would make would specifically reserve to the Agencies their full statutory authority, it preferred to avoid any financial responsibility and stay solely with its regulatory authority. Big Bend was willing to designate someone to set on such a board, but DWR, after initially expressing its willingness, decided that KDHE's position was a more realistic one for them. Plaintiffs informed the Court that if American Salt was in control of administration, they would prefer to forget the plan entirely and to take the judgment; they had encountered too many problems in dealing

with American Salt in the past to want to face it for another 35 to 50 years.

This issue, then, had developed into a major stumbling block to the implementation of any plan. Because the issue was a new one, the Court again ordered the parties, and requested the Agencies, to brief it regarding their suggestions as to oversight of a remedial action cleanup plan. The Court explained the problem in its order of May 6, 1986:

Specifically, the Court is concerned about oversight of a remedial action cleanup plan which has gone through a receding time span, but which by the most optimistic projections will still take a third of a century to complete. The Court has said in the past, and reaffirms now, that continuing jurisdiction in the United States District Court for the District of Kansas is *not* the solution, is judicially unsupportable, and will not be considered. Yet the Court easily discerns that ongoing problems will develop should a plan be ordered and implemented, and the Court recognizes that a mechanism for resolving such disputes *must* exist. Should no clear, defined and effective dispute resolution mechanism exist, one which all sides agree should govern the ongoing operations and is acceptable to the Court, this Court is convinced that ordering a cleanup would be a futile effort. In such a case, the Court would not order that a cleanup plan be implemented.

Such a mechanism should be empowered to approve modifications or changes in the plan as technical or environmental developments may dictate. It should be entrusted with financial oversight to approve expenditures from funds bonded for the cleanup operation. It should be capable of satisfactorily resolving any disputes that may arise, such as disputes between the landowners on whose property drilling must occur and the engineering or drilling firms who engage in the mechanics of a cleanup operation. Additionally, the Court believes that it should have input from the affected landowners, the salt company, and all of the affected state regulatory agencies. This would provide it with both a balanced approach and with the technical input needed to make the necessary decisions regarding the cleanup. Finally, and in the Court's opinion most importantly, it should not be controlled by either the salt company, the landowners, or the operators who do the work necessary for cleanup. Although participation by all of these may be, and probably is, essential; allowing any one of them to control the ongoing oversight would destroy the necessary impartiality that an equitable solution to this matter requires.

Unfortunately, the Court discovered during the course of the June 2 hearing that a Pandora's box of problems was opened by the discussion of this phase of any cleanup operation. At the outset, the Court would state unequivocally that it disagrees with defendants' representations that this is a "non-problem." The course of this case and the nature of the undertaking clearly show that someone or something must exist which can neutrally control the cleanup's development and address disputes and disagreements which will inevitably arise. The Court learned on June 2 that the construction of this "someone or something" was not a simple matter. The state agencies, with the exception of [Big Bend], were reluctant to be involved in such oversight that would be separate from their legally imposed regulatory responsibilities.... Plaintiffs expressed opposition to involvement by American Salt in any fashion. American Salt, conversely, was opposed to surrendering control of any mechanism that would impact their plant operations. In short, nothing approaching consensus developed at the hearing in this regard. As has already been said, the Court is persuaded that its approval of a remedial action cleanup plan without some form of a neutral oversight entity would be an empty gesture. In light of the extensive time that has been devoted to this matter, the Court would regret to see it collapse at this late date. Therefore, this final attempt is made to resolve the problem.

Dk. no. 674.

Simultaneous filings were ordered from the parties and the Agencies. Plaintiffs

suggested an entity similar to the one which the Court had proposed, but were somewhat stymied by the refusal of the Agencies to participate. They suggested that an independent arbitration panel could be used. Defendants suggested that KDHE, as the regulatory agency in the state with oversight in this area, should be given full authority to conduct any remedial action. They also suggested independent arbitrators for settling any other disputes, and suggested that, "the histrionics of plaintiffs' counsel" notwithstanding, the company and most of the landowners had been able to satisfactorily resolve problems themselves throughout the course of this phase. Dk. no. 679, p. 13. A written arbitration agreement was proposed. Big Bend indicated its willingness to oversee both technical and financial aspects of the remediation process. Both DWR and KDHE restated their statutory authority, but demurred from being involved in any financial or dispute resolution decisions.

The Court had previously shut off future filings from the parties regarding the proposed plans. With the receipt of the above comments, the Court's file was therefore complete, and it took the matter of remedial action under advisement.

### D. *Court's Analysis of the Proposed Remedial Action Plan*

Attempts by the Judges of this District to impose equitable remedies going beyond the mere award of money have met with criticism. *See* Note, *Remedial Activism: Judicial Bargaining with Punitive Damage Awards,* 19 Loy.L.A.L.Rev. 941 (1986); Note, *Civil Procedure—Remittitur of Punitive Damages in Exchange for Product Recall,* 34 U.Kan.L.Rev. 823 (1986). Nonetheless, this Court remains convinced that what it attempted to do in this case was appropriate. *Miller* was a trial to the Court, not to a jury, so no seventh amendment questions were involved. The remedial action required by the Court was not a modification of the initial judgment in the case, but a part of that judgment. The actions proposed by the Court, by which the defendants potentially might obtain some relief from the punitive damages, would have required significant effort and a considerable expenditure of funds which would be comparable to the punitive damages. Moreover, the actions proposed went to the nature of relief plaintiffs were seeking, and were consistent with the relief requested. Significantly, plaintiffs themselves favored this attempt—the proposal was not made over their objections but with their support. In light of these factors, it made sense for the Court to attempt to fashion a remedy which truly rectified the wrong, not merely compensated for it.

While the plaintiffs did support this proposal (the Court would not have pursued it without their support), it should be remembered that it was the Court itself which initially suggested the remedial cleanup. This Court desired to see a remedy fashioned which would, as much as possible, restore the environment to its pre-polluted state. It was willing, even eager, to use its equitable powers to bring about that result. This remedial action phase was not envisioned or embarked upon to trick defendants or to delay plaintiffs' recovery; it was done because the Court was willing to try to use its powers to right the wrong.

And the Court has tried. It has assiduously and conscientiously exerted every judicial effort. It has put as much effort into the post-trial phase of this case as it did in the pre-trial phase. It has read thousands of pages of documents and sat through endless hours of hearings in an attempt to reach the final goal of a feasible, Court-ordered remedial cleanup plan. It has constantly gone back to the parties (and the Agencies) to try one more time to work out the problems which prevented it from ordering a cleanup. And it has spent a considerable amount of time inchambers studying the submissions and discussing numerous alternatives with its staff in an attempt to find a workable solution. But the Court has concluded that, for this matter, no feasible court implemented cleanup plan can be found. Therefore, the Court now sadly abandons its attempt to fashion an equitable remedy and rejects all proposed plans.

The Court finds several problems with the proposals before it. First, they do not address the sodium pollution in the aquifer. It has clearly been established throughout the course of these hearings that the maximum sodium content at which water is fit for irrigation is far below the sodium level in this aquifer. It has also been clearly established that a sodium cleanup will take substantially longer than a chloride cleanup. The proposals for cleaning up chlorides are also technically sufficient to clean up sodium. But the plans must be operated significantly longer to clean up the sodium than they would need to be if only chlorides were cleaned up. This is why the Court, although not approving of the plaintiffs' suggestion to disregard sodium in a cleanup calculation, nevertheless allowed the plan developments to proceed; the Court knew that all plans were technically capable of removing both compounds from the water, and decided in the interest of keeping the controversy at the hearings to a minimum not to interfere with the parties' accommodation in this matter. Then, after an acceptable plan was developed, if ever, the sodium could be factored back in to determine a true plan length.

But when sodium is factored back in to the plans now before the Court, the time length arrived at is astounding. The chief problem with sodium is not that the plans are incapable of cleaning it up, it is that the plans will require a great amount of time to do so. Thus, the Ten Interceptor Well Plan, the favored plan before the Court, must be viewed not in terms of the 35–50 years suggested, but more in terms of 75–150 years. Even 35 years is too long for a Court to oversee remedial action; but when the plans are viewed in terms of what would really be required to effectuate a cleanup of the pollution, the length of time clearly becomes impossible.

It should not be thought that the Court is adverse to retaining jurisdiction to oversee implementation of remedial action. Recently, while this Opinion was being drafted, the Court ordered a remedial plan to be developed and implemented under its supervision in another matter. *Reece v. Gragg*, 650 F.Supp. 1297 (D.Kan.1986)

(county jail facility found unconstitutional; continued operation allowed only upon certain enumerated conditions, including the development by the county of an acceptable proposal to bring its jail facilities within constitutional parameters). The Court is at this very moment overseeing the development of that plan.

But a remedial action of the type envisioned in *Reece*, or of the type originally envisioned in this case, is not of such a long duration that it cannot effectively be managed by the Court. *Reece* at the longest should not involve this Court for over three years. When the Court embarked upon this adventure, it expected that a cleanup could be accomplished in five years. But a proposal which will, at a minimum, take 35–50 years, and in all probability two to three times as long, is a horse of a different color. No judicial precedent exists for retaining jurisdiction over a case for that length of time. Common sense dictates against it. The prospect of the Court attempting to oversee a matter of this duration is frightening. Even were he a much younger man, and had hopes of surviving the course of such a proposal, the Court would cringe at the specter of ongoing oversight of a matter predicted to last that long. Indeed, it is doubtful that retaining jurisdiction for that length of time can be legally supported. In this age of burgeoning and complex litigation, courts are not equipped to exercise continuing judicial supervision for decades. Litigation was not meant to be passed from one judge to other, succeeding, judges over long periods of time.

Therefore, the Court was required to look beyond itself for an administrative oversight authority. This is where the second problem arises. KDHE was willing to provide technical oversight, but no acceptable proposal for financial oversight could be developed. The rationale behind a court-ordered cleanup plan was that defendants could obtain some relief from the punitive damages for it. But if the Court were to give any credit to the defendants against the punitive damages, it would require defendants to bond the cost of the

remedial action plan initially. Once funds were bonded, the cost of the cleanup could be paid from them. But who would determine what was properly payable from the bonded monies as opposed to from the coffers of American Salt? Already, disputes have arisen over what costs are properly allocable to the plan, with plaintiffs' expert opposing defendants' attempt to charge nearly two million dollars of expenses already incurred against the plan cost. It does not take a crystal ball to see that disputes of this nature would be likely to continue to rise. In its order of May 6, 1986, quoted above, the Court explained that ordering the implementation of a plan without resolving this question would be futile. Unfortunately, the question was never resolved.

Defendants have never understood the importance of this factor to a Court-ordered plan. They asserted that KDHE could simply administer the entire thing. Indeed, it should be mentioned at this point that, only one month ago, KDHE, pursuant to its statutory responsibilities, entered into a signed agreement with American Salt and its parent corporation, AMS Industries, Inc. (formerly Cudahy Company), requiring a cleanup of the aquifer along the lines of the Ten Interceptor Well Plan proposed to this Court. The Court would not wish to belittle the importance of this agreement. By signing it, defendants have made significant admissions, particularly in paragraph 9 of the Findings of Fact which reads in part: "[t]his pollution has been caused substantially by the operations of the Lyons Plant by American Salt, AMS, and their predecessors in interest at various times since 1908." The Court does not foresee that KDHE's administration of this consent order will encounter the same difficulties that concerned the Court. The technical concerns in an undertaking of this nature are myriad, and as the cleanup plan is developed and implemented those concerns are sure to multiply. An administrative agency such as KDHE is designed to handle such a situation, while it would be at best difficult for a judicial body to deal with it. More importantly, KDHE has ordered this cleanup solely out of environmental concerns. It is not concerned with offsetting punitive damages, so it does not need to worry about which plan costs should be setoff from a sum certain. It merely requires American Salt to pay for all cleanup costs of whatever nature, and requires AMS to guarantee payment of these expenses in the event that American Salt does not or cannot pay them. Its task is accordingly much simpler than the Court's self-imposed task would have been.

The Court wishes to make clear that KDHE's implementation of this order was neither a surprise to the Court nor a unilateral action taken by it against the Court's wishes. As this Opinion has explained earlier, throughout the remedial phase of this case—a phase which KDHE has closely followed—KDHE has consistently assured the Court that it did not wish to interfere or preempt the Court's actions in any way. From the conversations that the Court had with KDHE, it appeared that KDHE would have issued such an order earlier than it did had it not been stepping aside out of respect to this Court's continuing jurisdiction in the matter. It appears that such a sweeping order was not entered into years ago in part because KDHE did not discover the full extent of the problem until the trial in this case revealed it. But after being apprised of the facts of the pollution, it has been ready to take action.

After the filings and hearing were concluded in this matter, KDHE informed the Court that it had decided that the Ten Interceptor Well Plan best addressed the pollution problem. It then privately notified the Court that it wished to enter an order along those lines under its own authority as the state agency with jurisdiction over environmental matters. But it also informed the Court that it would delay entering such an order if requested to do so by the Court. Because this Court has not wanted to appear to be exercising any jurisdiction over the state agencies, and because it was clear by then to the Court that, if the other details could be worked out and any plan were implemented, it would be the Ten Interceptor Well Plan, the Court did not ask KDHE to refrain

from action. It is important to understand that the Court did not ask KDHE to act either. KDHE operated independently, and with deference to this Court.

In light of KDHE's actions, defendants can be expected to ask the Court to merely incorporate KDHE's order as its own. But, as explained, the Court has concerns not addressed by KDHE's order. That a state regulatory agency, on its own initiative and under its own authority, takes such action does not resolve the matter before this Court. The Court therefore is unable to simply incorporate KDHE's order as its own.

Although defendants' agreement with KDHE is technically outside the scope of this suit, the question nonetheless arises whether their agreement with KDHE to clean up the aquifer does not call for some relief from the punitive damage award. The Court has seriously considered this question, separate and apart from the context of this case. The Court fully expects defendants to argue that since they have agreed to do in essence what the Court originally sought to have done—clean up the aquifer—the Court is *obligated* to remit the ten million dollar punitive award. The Court is not so obligated. As should be clear to all, and as defendants themselves have admitted, KDHE had the authority to do exactly what it has done even if the remedial phase of this case had never been embarked upon, indeed, even if this case had never been filed. *See* Transcript of June 2, 1986 hearing, p. 52. Frankly, the Court is pleased that state regulatory action is being taken that may result in the cleanup of the salt pollution. While one might question whether American Salt would have been so willing to enter into such a consent order absent the pressures resulting from this case, the Court will attribute at least some good intent to it on this account.

But the relationship of a 1987 consent order to a 1984 award of punitive damages is tenuous at best. An elementary aspect of punitive damages seems to have been forgotten in this case: they are awarded on account of *past* behavior. If punitive dam-

age awards could be remitted solely due to subsequent conduct, no punitive damages would ever be enforced in any case. Defendants would simply engage in ameliorative behavior until their conduct was deemed sufficient to vacate an award. It does not require a review of the law of punitive damages to show the error of this analysis. Defendants' conduct may serve to relieve them from future liability for similar offenses, but it does not require that an award based on their past offenses must be set aside.

The Court took the unusual step here of promising to consider remitting the punitive damage award in whole or in part upon the fulfillment of certain conditions by defendants, but they have wholly failed to meet those conditions. They may not substitute their own criteria for the Court's assessment in this matter. That KDHE may have borrowed from the discoveries and developments in this case is purely fortuitous. KDHE made its order out of environmental concerns, but the Court addresses an unrelated question in its determination of whether the punitive damage award is appropriate. That question involves the Court's assessment of defendants' state of mind as determined by their good faith conduct in developing and implementing a remedial action plan. *See Miller*, Conclusion of Law ¶ 37,592 F.Supp. at 1007 (also quoted above in this Opinion). The Court now turns to that assessment.

This assessment addresses two issues: its relationship to the feasibility of a Court-ordered plan and its relationship to the question of whether the punitive damage award is appropriate. As to plan implementation, any remittance of punitive damages in consideration of a Court-ordered plan would require cooperation between plaintiffs and defendants in the ongoing oversight of the plan's implementation. That the two sides have never gotten along will come as no surprise to anyone who is acquainted even slightly with this matter. Like a weary parent, the Court has continued to hope that an agreement eventually could be reached. Perhaps the Court was naive, for if there has been one constant throughout this case, it has been the con-

tentious spirit of the parties. From the first threat of filing this action (where defendants threatened plaintiffs that, if suit were filed, defendants' attorneys would drag the matter out until plaintiffs were broke and defendants owned their land), to the closing of the last remedial hearing (where both defendants and plaintiffs intimated that they would oppose any plan administration which gave *any* role to the other side), the drama of this case has resembled the Hatfields' and McCoys' dispute.

Defendants have suggested that it is the counsel for both sides who are feuding; the parties themselves largely are cooperative. The Court would like to believe this, but it has seen no indication of such harmony. Instead, to cite only one example, it sees incidents like the one occurring on June 18, 1986. On that day, according to letters the Court received from both sides, plaintiffs appeared at the American Salt plant for a prearranged inspection of the plant premise for buried salt. This inspection was arranged as a result of a matter raised by plaintiffs at the February 21, 1986 hearing; it was part of a compromise by which plaintiffs agreed to drop a motion for injunctive relief. Plaintiffs were represented at that inspection by both Cecil Miller and by a law clerk from plaintiffs' attorneys' office. Defendants objected that the arrangement allowed for only *one* representative of the plaintiffs to make the inspection, and hard as it is to believe, the tour was delayed for forty-five minutes while this insignificant matter of "one inspector or two" was hotly debated. The law clerk was finally sent away, and Miller alone conducted the inspection. American Salt allowed a representative of KDHE to accompany them, but also prevented a representative of Big Bend from taking the tour, saying a Court order would be required before Big Bend could participate in the inspection.

The law clerk left the premises and went to Miller's land which adjoined the salt plant to take photographs. In doing so, he apparently overstepped the property line onto American Salt's land. The plant manager himself gave chase to the clerk, and when he could not apprehend him, had his secretary call the county sheriff's office to arrest the clerk for trespass. He was so arrested, and given Miranda warnings before he was released. In light of such incidents, it is difficult for the Court to believe that plaintiffs and defendants are coexisting and working together peaceably.

Although, as in any quarrel, fault probably lies on both sides, from the Court's observations it must conclude that the lion's share of the fault lies with defendants. Their cavalier and calloused attitude throughout the remedial phase of the suit almost seems to have been designed to antagonize plaintiffs. While they have diligently investigated the aquifer, they have utilized the results of that investigation to attack the Court's findings of liability and actual damages (issues no longer open) at least as much as they have used them to develop remedial cleanup plans. This misuse is relevant to their "good faith."

In developing cleanup plans, they initially concluded their fourteen month investigation with a report to the Court that the only feasible and logical cleanup plan was one that would take literally centuries; but when it became apparent that the Court was not receptive to this proposal, their estimates of plan time dropped like a thermometer before a winter storm. They ended up with a proposal only a third as long as their original one (from the 100 year chlorides-only Base plan to the 32 year plan), without a dramatic increase in present value cost. That they did not attempt to develop a plan of reasonable length initially also goes to good faith, especially considering the slight difference in cost. When defendants did develop modifications to their plan, they did so at the last hour, after having told plaintiffs that they were not changing their proposal to the Court. This appeared to be an abortive attempt to preclude plaintiffs from being prepared to critique the new plan as they had critiqued the Base plan.

In short, defendants conduct has *not* been one of attempting in good faith to develop the best possible proposal to clean up the aquifer: they have clearly tried to skate by with as little as possible, they

have resisted and attempted to prevent plaintiffs' input to the proposals, and they have utterly failed to demonstrate the attitude of contriteness in remedying the wrongs they created—an essential ingredient in any review of punitive damages. Instead, they have yet to admit to this Court that they did anything wrong at all. At times, when they point a finger to the Carey salt plume upstream or defend their inaction in the brine fields by claiming that, since the fields were not leaking, the defendants cannot be blamed for not fixing them, defendants actually seem to be denying that they had anything to do with the salt getting into the aquifer in the first place!

Therefore, the Court concludes that defendants' lack of good faith in developing their proposal and working with the plaintiffs during the remedial phase of this case precludes any possibility that they could be trusted to honestly pursue a cleanup attempt on the plaintiffs' land in the years to come. Moreover, the Court finds that this lack of good faith also mitigates against any argument that the original award of punitive damages was unjustified. The evidence at trial portrayed a "corporate callousness" on the part of American Salt that seemed to warrant the imposition of the ten million punitive damage award. Defendants conduct during the post trial proceedings have shown that this initial impression was correct.

 A Court-ordered cleanup plan is therefore rejected because no feasible plan has been presented, and because defendants' conduct during the remedial course of these hearings has militated against the possibility that such a plan could be satisfactorily implemented. Either of these reasons are sufficient to reject a plan, but the Court finds a third reason as well. Initially, plaintiffs favored a cleanup attempt. At trial they indicated that if they could have their choice of remedy, they would choose clean water over money. *Miller*, 592 F.Supp. at 998. Although plaintiffs may still prefer this remedy in the abstract, they have begun to indicate to the Court their hesitancy about pursuing this remedy

in the concrete. At the January, 1986, hearing, plaintiffs' counsel summed up plaintiffs' objection to the Base plan thusly: "This plan calls for my clients to be married to the defendants for two hundred years; but, your Honor, we aren't getting along *now.*" Plaintiffs continual trouble with defendants has led to the change in plaintiffs' support of remedial action. More than once they have told the Court that, if things continued as they were, they would prefer to just take the money and foget about working out a remedial plan with the defendants. The Court cannot blame plaintiffs for their frustration. The Court has not seen anything to persuade it that things will not continue as they have been. Defendants dismiss these problems. "Despite certain recent and disturbing statements by plaintiffs' counsel, we trust and fully expect that plaintiffs were then, and are now, men and women of their word and that the position they ultimately take will unequivocally confirm their initial representation to the Court." Dk. 661, p. 3. This Court finds that defendants' betrayal of faith removes any question of the trustworthiness of plaintiffs' word. And this Court would be reluctant to order implementation of any remedial plan without the support of the plaintiffs.

Defendants cannot claim that the Court has duped them by requiring the expenditure of all of these investigation costs, and then imposing the full amount of punitive damages. Despite attempts by defendants to imply otherwise, the Court made no promises or guarantees of punitive damage reduction at the beginning of the remedial phase. Had the Court not ordered this phase, KDHE would have required similar action and equivalent expenditures from them anyway. More particularly, had defendants properly investigated the aquifer prior to trial so that the recharge rate and the SAR phenomenon were known then (see New Trial section, *supra*), it would have been clear at trial that a cleanup could not occur within the parameters desired by the plaintiffs and the Court. In that instance, the Court would never have embarked upon this phase. Defendants can blame no one but themselves that these

factors were not known and that this stage was not avoided.

Therefore, the Court finds that no feasible, Court-implementable plan has been presented and that defendants' conduct throughout the remedial phase of this case does not warrant a reduction in the punitive damage award initially made. Accordingly, defendants are ordered to pay the ten million punitive damage award, together with interest from August 13, 1984; the initial date of judgment.

## VI. CONCLUSION

Following a lengthy trial, this Court found for plaintiffs and awarded them 3.06 million dollars in actual damages. The Court further found that defendants' conduct warranted a punitive damage award of ten million dollars. Because plaintiffs had indicated their preference for clean water over money, and because testimony had been presented that a cleanup might be technically feasible, the Court held the punitive damage award temporarily in abeyance, pending defendants' good faith efforts to define and remedy the pollution they had caused. The Court indicated that, if defendants made a conscientious, good faith and realistic effort to remedy the pollution *within a reasonable time,* that effort would be extremely relevant to the Court's assessment of the defendants' state of mind and to the appropriateness of the punitive damage award.

After an investigation and development period, defendants presented a cleanup plan lasting far longer than ever envisioned. Even at the end of the defendants' continual reductions in plan time, the Court finds that the pollution is still not remediable *within a reasonable time.* Moreover, the Court finds that defendants' conduct has been extremely relevant to the Court's assessment of the defendants' state of mind: it has demonstrated that the initial punitive damage award was appropriate.

Most relevant of all is that, throughout this time, the defendants have continued to pollute. This is relevant to cleanup time, for continual pollution clearly extends the time necessary for cleanup. It is relevant to defendants' state of mind, for while they have exerted incredible effort in attacking the Court's judgment and arguing for the cleanup plan most favorable to them, they have failed to exert the necessary effort to stop their continual pollution. The Court therefore declines to remit any of the punitive damage award, because it is abundantly clear to the Court that we are no further along than we ever were: the "hog is still in the spring." *Miller,* 592 F. Supp. at 1008.

IT IS THEREFORE ORDERED that plaintiffs' motion to strike the reply memorandum in support of General Host's motion to dismiss is hereby denied.

IT IS FURTHER ORDERED that General Host's motion to dismiss is hereby denied.

IT IS FURTHER ORDERED that defendants' motion for a new trial on the ground of newly discovered evidence is hereby denied.

IT IS FURTHER ORDERED that defendants' motion to revise and amend the findings of fact and conclusions of law, or in the alternative, for a new trial, on the ground of newly discovered evidence, is hereby denied.

IT IS FURTHER ORDERED that defendants' motion to revise or amend the Court's opinion to dismiss the claims for lost crop profits for those plaintiffs who have no water permits is hereby denied.

IT IS FURTHER ORDERED that plaintiffs' motion for costs, expenses and fees is hereby granted as to fees for transcripts, witness fees, copying expenses, postage, long distance telephone expenses, and all fees billed by Dr. Raviv in connection with his work on defendants' development of a remedial action cleanup plan, including any lab fees related to that work; and is hereby denied as to attorneys' fees, attorneys' travel expenses, and all expert fees and lab fees not incurred pursuant to Dr. Raviv's work on defendants' development of their remedial plans. Plaintiffs are hereby ordered to submit within twenty days from the date of this order a revised statement of all post-trial costs for which the Court

**358**

has authorized recovery. Defendants are to file their objections to plaintiffs' statement, if any, within ten days from the date of plaintiffs' filing.

IT IS FURTHER ORDERED that plaintiffs' motion to strike the affidavit of Elly Triegel is hereby granted.

IT IS FURTHER ORDERED that plaintiffs' motion to strike the status report of defendants' experts, filed on September 23, 1986, is hereby denied.

IT IS FURTHER ORDERED that defendants' motion to preclude consideration of non-evidentiary matters is, based upon the Court's interpretation of this motion as set out in this opinion, hereby granted.

IT IS FURTHER ORDERED that all proposed remedial action plans presented by defendants are hereby rejected, and defendants are hereby ordered to pay the actual and punitive damages initially assessed, together with statutory interest thereon from August 13, 1984; the initial date of judgment.